# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-CA-01171-SCT

*MARY K. LAWSON HENDERSON*

*v.*

*HOWARD HUGH HENDERSON*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/17/1998 |
| TRIAL JUDGE: | HON. WILLIAM JOSEPH LUTZ |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LISA B. MILNER |
| | TAMMY M. VOYNIK |
| ATTORNEY FOR APPELLEE: | JOHN ROBERT WHITE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED - 4/13/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/4/2000 |

**EN BANC.**

**MILLS, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. This appeal arises from the June 17, 1998, decree of the Madison County Chancery Court ordering the equitable distribution of Mary and Howard Henderson's property incident to their divorce. This case was initially tried in 1994, at which time Mary was granted a divorce from Howard on the ground of uncondoned adultery. She was given custody of their minor child, awarded assets valued well in excess of $350,000, and granted periodic alimony in the amount of $683 per month. In contrast, Howard was awarded assets valued at under $20,000. The Court of Appeals affirmed the chancery court's order with regard to the distribution of assets and alimony. This Court, however, having granted Howard's petition for writ of certiorari, found that the chancery court failed to classify assets as marital or nonmarital, failed to make on-the-record determinations of the economic issues presented, and failed to consider the equitable distribution of the marital assets in conjunction with the award of alimony. Accordingly, the case was reversed and remanded on all economic issues.

¶2. The matter was retried in 1998, whereupon the chancellor, having classified all assets as marital or nonmarital, awarded Mary's mother one third of the net equity in the marital domicile and divided the

remainder of the marital estate equally between Mary and Howard. Neither party was awarded periodic alimony.

¶3. Aggrieved by the chancellor's order, Mary appeals to this Court asserting the following issues as error:

**I. Whether the chancery court erred in granting Howard one third of the net equity in the marital domicile when the majority of the construction costs were contributed by Mary's mother.**

**II. Whether the amount awarded to Howard, totaling $91,640.90, was excessive and inequitable under the circumstances of the case.**

**III. Whether the chancery court erred in failing to grant Mary permanent periodic alimony and ordering her to repay amounts received as alimony pursuant to the 1994 judgment.**

Howard, on cross-appeal, offers one assignment of error:

**IV. Whether the chancery court erred in awarding Mary's deceased mother a one third equitable interest in the marital domicile.**

## STATEMENT OF FACTS

¶4. The underlying facts of this case are largely undisputed and are laid out in the Court's original decision, *Henderson v. Henderson*, 703 So. 2d 262 (Miss. 1997). They are summarized here, along with subsequent events relevant to this appeal.

¶5. Mary and Howard Henderson were married in 1981 and divorced in 1994. One child was born to the marriage, Ryan Lawson, born July 21, 1982. At the time of the divorce, Howard was earning approximately $65,000 per year as a parts and service director at Patty Peck Honda, and Mary was earning approximately $35,000 as a public school teacher.

¶6. During their first year of marriage, Howard and Mary lived in a house trailer owned by Howard. The following year, they moved into a traditional home on Springdale Road. Mary's father, J.B. Lawson, contributed approximately $32,000 to the purchase and improvement of this house. The Springdale Road house was eventually sold, and the proceeds, which totaled $44,743, were invested in the construction of a 3,600 square foot house at 123 Carriage Lane in Madison, Mississippi.

¶7. Mary and Howard began construction on this new home in 1991. The testimony of the parties indicates that the Carriage Lane home cost approximately $235,000 to build. Of this amount, Mary's mother, Lula Lawson, contributed approximately $120,000.

¶8. Both parties testified at trial that Mrs. Lawson made this contribution with the expectation of living in the Carriage Lane home under the care of Mary and Howard until her death. The house was built handicap accessible, and handrails were installed throughout the home to accommodate Mrs. Lawson.

¶9. In July of 1992, Mary, Howard, Ryan, and Mrs. Lawson moved into the house on Carriage Lane with Mrs. Lawson occupying a separate apartment attached to the house. In October of 1993, Howard and Mary separated. Howard left the marital home, and shortly thereafter, Mary filed for divorce on the ground of uncondoned adultery and, alternatively, irreconcilable differences.

¶10. On October 12, 1994, in a corrected final judgment of divorce, Chancellor Ray H. Montgomery granted Mary a divorce from Howard on the ground of uncondoned adultery. Mary was awarded custody of Ryan, and Howard was ordered to pay $560 per month in child support.

¶11. Mary was granted full use and ownership of the Carriage Lane home which had a net equity of approximately $200,000; a Medley/Schwab account, valued at $46,000; an A..B. Culbertson account, valued at $19,212.21; her teacher's retirement account, valued at $36,000; her annuity account, valued at approximately $4,800; her credit union account, valued at $5,062.12; a checking account valued at $700; and a 1991 Dodge Caravan, valued at approximately $8,000. She was also awarded $683 per month in periodic alimony and $4,352.92 in attorney's fees and expenses.

¶12. Howard was awarded a pontoon boat, valued between $5,000 and $6,000; a 401K plan, valued at $1,300; an A.B. Culbertson account, valued at $9,000; a bicycle rack; a stereo receiver; a turntable; tapes; and a watercolor painting.

¶13. Aggrieved, Howard appealed. The Court of Appeals affirmed in part and reversed and rendered in part. *Henderson v. Henderson*, 691 So.2d 1037 (Miss. Ct. App. 1996) (table).

¶14. This Court on writ of certiorari affirmed as to the granting of the divorce but reversed and remanded on all economic issues, finding that the chancellor failed to make the requisite findings of fact with regard to the classification of assets as marital or non-marital, failed to consider the equitable distribution of the marital assets in conjunction with the award of periodic alimony, and failed to make the requisite on the record determinations of the economic issues. *Henderson*, 703 So.2d at 262.

¶15. On remand, Chancellor Lutz, in an order dated June 17, 1998, made specific determinations regarding the classification of the assets as marital and non-marital and made awards accordingly. He specifically granted the following assets to Mary: 1) possession of the marital home; 2) one third of the net equity of the marital home at the time of the divorce or $66,633.33; 3) PERS account in the amount of $36,000; 4) Medley/Schwab account of $48,000 (a gift from her parents that was never commingled); 5) Culbertson account of $19,212 (also a gift from her parents that was never commingled); 6) $4800 in her Tax Sheltered Annuity; 7) $5,062 in the Credit Union Account; 8) $700 in her checking account; 9) the Dodge van valued at $8,000; 10) the home furnishings valued at $5,000; 11) monthly child support in the amount of $600; and 12) life insurance policy covering Howard in the amount of $70,000.

¶16. Howard received the following assets: 1) one third of the net equity of the marital home at the time of the divorce or $66,633.33; 2) $13,453.57 as property settlement; 3) the pontoon boat valued at $5,500; 4) his 401K valued at $1,300; 5) Culbertson Account valued at $9,000; and 6) his checking account in the amount of $3,000.

¶17. The most significant of the chancellor's findings was his determination that one third of the net equity in the Carriage Lane home was nonmarital property belonging to Mrs. Lawson. As Mrs. Lawson had died in the interim between trials, the award was made to her estate. Mary is Mrs. Lawson's sole heir; as such, the award to Mrs. Lawson went to her. In dividing the marital estate, the chancellor awarded the marital home to Mary with Howard receiving one third of its net equity. Of the remaining marital assets, Mary received $45,707.14 and Howard received $18,800. To compensate for this discrepancy, Mary was required to pay Howard $13,453.57 as a property settlement.

¶18. In considering the issue of alimony, Chancellor Lutz found that Mary was entitled to $400 per month in rehabilitative alimony for 36 months totaling $14,400, but denied her request for permanent periodic alimony. Chancellor Lutz further ordered Mary to repay the $25,954 she received in periodic alimony pursuant to Chancellor Montgomery's 1994 divorce order. Offsetting this amount against the amount of rehabilitative alimony to which he found her entitled, Chancellor Lutz ordered Mary to repay Howard $11,554.

## STANDARD OF REVIEW

¶19. In matters of equitable distribution and alimony, the Court enjoys only limited powers of review. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record. *Hammett v. Woods*, 602 So.2d 825, 827 (Miss. 1992). In other words, "[t]he Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Bell v. Parker*, 563 So.2d 594, 596-97 (Miss. 1990).

## DISCUSSION

¶20. The appropriate process by which marital assets should be distributed pursuant to divorce is well settled.

> First, the character of the parties' assets, i.e., marital or nonmarital, must be determined . . . The marital property is then equitably divided, employing the *Ferguson* factors as guidelines, in light of each parties' nonmarital property. *Ferguson*, 639 So.2d at 928. If there are sufficient marital assets which, when equitably divided and considered with each spouse's nonmarital assets, will adequately provide for both parties, no more need be done. If the situation is such that an equitable division of marital property, considered with each party's nonmarital assets, leaves a deficit for one party, then alimony based on the value of nonmarital assets should be considered.

*Johnson v. Johnson*, 650 So.2d 1281, 1287 (Miss. 1994). In support of the order, the chancellor must also provide specific findings of fact with regard to property acquisition, classification of assets, and distribution of the marital estate. *Henderson v. Henderson* 703 So. 2d 262, 264 (Miss. 1997). In light of the foregoing criteria, the assignments of error regarding the equitable distribution of property proffered by Howard and Mary are addressed below. Howard's issue on cross-appeal will be addressed first.

> **I. Whether the chancellor committed manifest error in awarding Mary's deceased mother a one third equitable interest in the marital domicile.**

¶21. The chancellor below found that Mary's mother contributed approximately $116,000 to the construction of the house on Carriage Lane, and that, in return, she expected to live there as long as her health permitted. Both parties testified at trial that it was understood that Mrs. Lawson would live with them in the Carriage Lane home and that they would care for her until her death. Mrs. Lawson was, in fact, living in the Carriage Lane home at the time of the divorce in 1994, and continued to live there until her death.

¶22. Based on these findings, the chancellor concluded that Mrs. Lawson gave the money to the Hendersons in a "bargained for exchange" and, therefore, had a viable interest in the marital domicile. In light of this conclusion, he awarded the estate of Mrs. Lawson $66,633.33, which represented one third of the net equity of the home.

¶23. On cross-appeal to this Court, Howard complains that the chancellor committed manifest error in awarding Mary's mother an equitable interest in the home. He requests that the interest allocated to Mrs. Lawson by the chancellor be returned to the marital estate and divided equally between him and Mary. Howard submits that it was never contemplated that Mrs. Lawson would receive any ownership interest in the house. Rather, he argues, she furnished the money for the construction of the house in exchange for the assurance that she could live there and be taken care of for the remainder of her life.

¶24. This contention is clearly supported by the record. Both parties testified that Mrs. Lawson did not expect to own any part of the house. She expected only to live there under Mary and Howard's care until her death. Howard argues that as Mrs. Lawson was able to live in the Carriage Lane home until she died, any obligation owed to her has been satisfied. In response to Howard's complaint, Mary argues that Mrs. Lawson did, in fact, intend to procure an interest in the Carriage Lane home. She contends that Mrs. Lawson's monetary contributions to the construction of the house were made in the anticipation that the house would belong to her as well. Mary's argument is without merit. At trial both parties testified with respect to Mrs. Lawson's expectations in the Carriage Lane home. Their testimony clearly illustrates that neither Howard, Mary, nor her mother ever anticipated that Mrs. Lawson would receive an ownership interest in the house in exchange for her money. The house was titled to Mary and Howard as joint tenants and was intended by all parties to be the Hendersons' marital domicile. Mrs. Lawson was not named in the deed, nor was any written document presented evidencing any ownership in the house in her. Mrs. Lawson was able to live in the house on Carriage Lane until her death, and as such, her estate has no further claim upon the property.

¶25. In light of the above, we hold that the chancellor improperly considered Mrs. Lawson's contributions to the Carriage Lane home and that his award of one third of the net equity in the home to Mrs. Lawson runs contrary to the facts contained in the record. However, this does not end our analysis.

¶26. The record shows that the chancellor considered Mrs. Lawson's $116,000 contribution in determining what share of the marital domicile was due to both parties under the first *Ferguson* factor. *Ferguson v. Ferguson*, 639 So.2d 921, 928 (Miss. 1994). He determined that the $116,000 was Mary's contribution alone. This was also error. Mrs. Lawson's $116,000 contribution was not a gift to her daughter. It was the consideration in an agreement between Mrs. Lawson and the Hendersons. It was procured by both Mary and Howard. We have stated that all assets "acquired or accumulated during the marriage" are marital assets subject to equitable distribution. *Hemsley v. Hemsley*, 639 So.2d 909, 915 (Miss. 1994). Therefore, Mary alone did not directly or indirectly contribute $116,000 to the acquisition of the marital home. Gifts may be made to either party to a marriage or to the marital union itself. Under facts such as those before us, we can only conclude that the contribution of Mary's father, on the one hand, and the contributions bargained for from Mrs. Lawson on the other, were both made to the marital union of the parties, rather than to an individual partner of the marriage. Therefore, such assets, absent clear proof otherwise, are assets of the marital estate. To the contrary, in this case, we find the separate investment accounts given by her parents to Mary to be part of her separate estate since these assets clearly were given to her individually and were never commingled with marital assets. Both Mary and Howard contributed this amount together.

¶27. Therefore, it was error for the chancellor to consider Mrs. Lawson's contribution as a factor weighing in Mary's favor alone in determining what share of the marital home Mary and Howard would each receive.

¶28. Having established these points, we must now consider the overall distribution of the marital estate to determine equity and fairness.

### II. Whether the chancellor erred in granting Howard $66,633.33 or one third of the net equity in the marital domicile when the bulk of the construction costs were contributed by Mary's mother.

¶29. Mary argues on appeal that the chancellor committed manifest error in awarding Howard one third of the net equity in the Carriage Lane house considering that Mary's mother paid for the bulk of construction. Mary contends that Howard received a windfall in that his contribution to the building cost was insignificant relative to that made by Mrs. Lawson. Based on this fact, Mary urges this Court to reverse the chancellor's decision and remand for a more equitable distribution.

¶30. Consistent with our findings in issue I above that the chancellor should not have awarded a one third interest in the marital home to Mrs. Lawson, nor should he have taken into consideration Mrs. Lawson's contribution to the building of the marital home as favoring Mary alone, and after weighing the factors established in *Ferguson*, we now hold that Howard should receive a one half share of the net equity in the home.

¶31. Testimony at trial established that the Carriage Lane home cost approximately $235,000 to build and was financed as follows: the $116,000 consideration from Mrs. Lawson; the $44,743 netted from the sale of their house on Springdale Road; and a construction loan for an additional $70,000. Testimony further established that Howard participated to some extent in building the house in that he assisted in constructing the frame, built all the decks, and did what he could to minimize building costs.

¶32. Howard lived in the Carriage Lane house for one year and two months. During this time, Howard and Mary paid roughly $9,500 in house payments from their joint account. Howard did not contribute to the house payments beyond the couple's separation.

¶33. The chancellor is afforded broad discretion in effecting the equitable distribution of the marital estate, but he is required to consider, where applicable, the following factors:

(1) the economic and domestic contributions by each party to the marriage, (2) the expenditures and disposal of the marital assets by each party, (3) the market value and emotional value of the marital assets, (4) the value of the nonmarital property, (5) tax, economic, contractual, and legal consequences of the distribution, (6) the elimination of alimony and other future frictional contact between the parties, (7) the income and earning capacity of each party, and (8) any other relevant factor that should be considered in making an equitable distribution.

*Bullock v. Bullock*, 699 So. 2d 1205, 1211 (Miss. 1997) (quoting *Love v. Love*, 687 So. 2d 1229, 1231-32 (Miss. 1997).

¶34. In the case sub judice, the chancellor, in applying the foregoing guidelines, found that both Mary and Howard worked during the marriage. Each made significant financial contributions to the support of the family and neither spouse unnecessarily expended marital funds. Consistent with the testimony at trial, the chancellor acknowledged that Howard contributed more financially to the family unit than Mary. However, he found that Mary provided a significant amount of domestic work and was a strong maternal presence in the family, while Howard was a strong father figure and a "jack of all trades" around the home. He

recognized that the Carriage Lane house had a market value of $285,000, as stipulated by the parties. He also recognized that Mary had a strong emotional attachment to the home. The chancellor further found that Mary, unlike Howard, had a separate vested retirement plan and a significant separate estate of approximately $79,066.86.

¶35. Additional information in the record indicates that Howard and Mary both worked during the marriage. At the time of the 1994 trial Howard was earning a gross income of approximately $65,000; Mary was earning about $35,400. The couple maintained a joint account into which their incomes were deposited, and both incomes were used to pay the family's bills. At the time of the 1998 trial, Mary's income had increased to approximately $42,000; Howard's income had remained the same.

¶36. The record also indicates that during the marriage, Mary took voluntary deductions from her monthly check which went into her own savings, a salary protection plan, and a cancer policy in addition to her health insurance. In contrast, all of Howard earnings, excepting mandatory deductions, were deposited in their joint account and used to meet the family's needs. He had no separate savings plan nor significant retirement account. Virtually all of Howard's earnings went into the building and maintenance of the home while Mary enjoyed substantial deductions for her separate savings and retirement accounts.

¶37. It is clear that each party made significant contributions to the acquisition of the marital home. However, in determining the equitable distribution of marital assets we also remember our analysis in *Trovato v. Trovato*, 649 So. 2d 815 (Miss. 1995) wherein we found that a spouse is not per se entitled to a share of a marital asset proportionately equal to her economic contribution to the asset's acquisition. Rather, economic contribution to the acquisition of a marital asset is but one of many factors that must be considered. Furthermore, we stated in *Hemsley* that the economic contributions of individual partners should be considered of equal value regardless of the ostensible disparity:

> We, today, recognize that marital partners can be equal contributors whether or not they both are at work in the marketplace.
>
> . . . .
>
> We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value.

*Hemsley*, 639 So.2d at 915. Thus, the fact that Howard made a larger financial contribution than Mary to the acquisition of the marital home does not necessarily warrant awarding him a greater share. The chancellor found and the record reflects that a weighing of all the other *Ferguson* factors yields a balance between both Mary and Howard. Therefore, the net equity at the time of the divorce of the marital home, which the chancellor determined to be $199,900, should be divided equally between the two. We do not divide the current net equity of the home or considered growth in value subsequent to the divorce since Mary has been living in, maintaining and paying the mortgage on the house since the divorce. Mary should benefit from any appreciation in the value of the house since that time.

### III. Whether the total amount awarded to Howard was excessive.

¶38. Mary also argues that the aggregate award given Howard, which came to approximately $99,000, was excessive given the circumstances of the case. In addition to one third of the net equity in the marital home, valued at $66,633.33, the chancellor awarded Howard marital assets valued at $18,800 and

ordered Mary to pay Howard $13,543.57 as a property settlement. Mary claims that this award is excessive and amounts to manifest error. The crux of Mary's argument is that the chancellor failed to consider properly the *Ferguson* factors when distributing the property. We hold that Mary's claim is without merit for the same reasons as stated above.

¶39. The chancellor made specific findings with regard to the *Ferguson* factors, and those findings are supported by the record. Of particular weight is the fact that Mary had a significant separate estate and a vested retirement, while Howard had no separate estate and little retirement funds. Therefore, we hold that the amount awarded to Howard was not excessive.

### II. Whether the lower court erred in failing to grant Mary permanent periodic alimony and ordering her to repay amounts received as alimony pursuant to the 1994 judgment.

¶40. The final issue before the Court is whether the chancellor committed manifest error in denying Mary's request for permanent periodic alimony and ordering her to repay the alimony she received from Howard pursuant to the 1994 order. She argues that the chancellor failed to consider properly the discrepancy in the incomes and expenses of the parties, their respective ages, and Howard's adultery.

¶41. "Whether to award alimony, and the amount to be awarded, are largely within the discretion of the chancellor."*Magee v. Magee*, 661 So.2d 1117, 1122 (Miss. 1995) (quoting *Cherry v. Cherry*, 593 So.2d 13, 19 (Miss. 1991)). While this is true, the chancellor must still consider the following factors when evaluating the need for alimony:

1. The income and expenses of the parties;

2. The health and earning capacities of the parties;

3. The needs of each party;

4. The obligations and assets of each party;

5. The length of the marriage;

6. The presence or absence of minor children in the home, which may require that one or both of the parties either pay, or personally provide, child care;

7. The age of the parties;

8. The standard of living of the parties, both during the marriage and at the time of the support determination;

9. The tax consequences of the spousal support order;

10. Fault or misconduct;

11. Wasteful dissipation of assets by either party; or

12. Any other factor deemed by the court to be "just and equitable" in connection with the setting of spousal support.

*Armstrong v. Armstrong*, 618 So.2d 1278, 1280 (Miss. 1993) (citing *Hammonds v. Hammonds*, 597 So.2d 653, 655 (Miss.1992)). The chancellor made specific findings on each of the above listed factors. Those findings relevant to Mary's assignment of error are set forth below.

¶42. With regard to the income and expenses of the parties, the chancellor found the following:

Mary's 1994 budget was reviewed carefully and several expenditures were found to be excessive or unnecessary. In reviewing Mary's deductions the Court finds that the deductions for an annuity, savings bonds and credit union are voluntary and will be added back to Mary's income. This increases Mary's monthly income to $1,807.63. The Court finds the following expenses excessive as listed in Mary's financial statement and makes the following adjustments: telephone $50 dollars, clothing $150, entertainment $200, incidentals $100, school tuition $0, Ryan's school supplies $25, Ryan's incidentals $25, Ryan's sports activities, $50. Mary's reasonable monthly expenses at the time of trial were $2,830.32.

Howard's net income at the time of trial was $3,387.29. The Court finds his listed expenses to be reasonable and total $1,910.73.

¶43. With regard to Howard's adulterous relationship, the chancellor found that Howard had admitted committing adultery but testified that the adultery occurred after the separation and was not the cause thereof. This testimony, apparently, was had during the first trial in 1994, as there is no evidence of it in the 1998 record.

¶44. With regard to the parties' ages, the chancellor found that Mary and Howard were 47 and 43, respectively.

¶45. In denying Mary's request for permanent periodic alimony, the chancellor recognized that Howard made more money than Mary, but noted that Mary had a substantial separate estate and a vested retirement. Howard had no separate estate and had been unable to save for retirement during the marriage. Howard would need to aggressively save in order to provide for his future. The chancellor strongly urged Mary to sell the house on Carriage Lane, noting that a 3,600 square foot home was an extravagance for two people. With her share of the equity in the home, she could afford to buy a smaller, more efficient home out right, thus eliminating her monthly house payment and realizing additional savings on the upkeep of a smaller home. The chancellor also found that Mary could increase her income by obtaining a masters degree in administration. Based on this he awarded her $14,400 in rehabilitative alimony. This amount was offset against the $25,954 she had received in periodic alimony, leaving a deficit of $11,554, which Mary was required to repay Howard.

¶46. We find that the chancellor properly considered the requisite factors in considering the issue of alimony and that his decision to deny Mary permanent periodic alimony was well within the chancellor's power and discretion in such cases. We therefore hold that Mary failed to show that the chancellor committed manifest error. The chancellor's order with regard to alimony is affirmed.

## CONCLUSION

¶47. In conclusion, we find that the Carriage Lane home was marital property to be divided equally between Howard and Mary at its value at the time of the divorce. The remaining assets should be awarded as follows:

**Mary Henderson**: 1) possession of the marital home; 2) one half of the net equity of the marital home at the time of the divorce or $99,950; 3) PERS account in the amount of $36,000; 4) Medley/Schwab account of $48,000 which; 5) Culbertson account of $19,212; 6) $4800 in her Tax Sheltered Annuity; 7) $5,062 in the Credit Union Account; 8) $700 in her checking account; 9) the Dodge van valued at $8,000; 10) the home furnishings valued at $5,000; 11) monthly child support in the amount of $600; 12) life insurance policy covering Howard in the amount of $70,000.

**Howard Henderson**: 1) one half of the net equity of the marital home at the time of the divorce or $99, 950; 2) $13,453.57 as property settlement; 3) the pontoon boat valued at $5,500; 4) his 401K valued at $1,300; 5) Culbertson Account valued at $9,000; 6) his checking account equaling $3,000.

¶48. We hold that an equitable lien in favor of Howard should be imposed against the Carriage Lane house for the value of the amount Mary owes Howard on repayment of alimony ($11,554) plus Howard's share of the net equity of the Carriage Lane house ($99,950). We remand to the lower court for such further orders as the chancellor may deem proper to resolve these issues in a manner consistent with this opinion.

¶49. **AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

> **PRATHER, C.J., BANKS, P.J., WALLER AND COBB, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

> **SMITH, JUSTICE, DISSENTING:**

¶50. In my view, the majority allows a windfall to Howard regarding the distribution of the proceeds concerning the couples' home. Here, it is clear that Mary through large financial contributions from her mother, made significantly a larger contribution to the overall value of the home, thus equal distribution is an abuse of discretion. I respectfully disagree and accordingly dissent.

> **PITTMAN, P.J., JOINS THIS OPINION.**

> **McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶51. While I agree that the majority is correct in dividing the marital home equally between Howard and Mary, it errs in using the value of the home at the time of the divorce instead of present day value. Such an error provides Mary Henderson with a tremendous windfall at the expense of her ex-husband. The house should be divided equally at present value with Mary being credited for the house payments, or a portion thereof, she made after separation. Originally the chancellor divided the interest of the house using 1994 as the time to establish the value of the house which was wrong as it should have been from the date of the hearing. We should not set it here because we do not know if the value has since gone up or down. Accordingly, I dissent.

¶52. Today's majority opinion focuses on the net equity of the marital home at the time of the divorce, which the chancellor determined to be $199,900. Since then property values have skyrocketed in Madison County, Mississippi. Such an oversight by the majority produces a windfall of at the very least $50,000 for Mary Henderson. If today's values were used, the house and property would probably be valued at

approximately $350,000 and at the very least $325,000 in June, 1998, thus creating a greater windfall.

¶53. The majority recognizes that since present day value of the house is not being considered, Mary will benefit from any appreciation in the value of the house. It allows this based on the fact that Mary has been paying the mortgage on the house for the past six years. Such a proposition is ludicrous when considering that Mary would have been forced to pay rent regardless of where she lived and taking into account what Howard contributed during the marriage. If this Court chooses to consider Mary's recent mortgage payments which have taken place **after** the divorce settlement, then it must surely look to the present value of the house.

¶54. An examination of the amount of money each party made during the marriage demonstrates that Howard contributed almost $200,000 more than his wife did, even were we to include the money given by Mrs. Lawson. During the marriage, Howard earned $492,630 and his wife contributed a total of $300,485 including the money given by her parents. One of the factors to be used in dividing the marital assets is substantial contribution to the accumulation of the property. *Ferguson v. Ferguson*, 639 So.2d 921, 928 (Miss. 1994).

¶55. The chancellor found that Howard not only played a part in building the house financially, but he also took an active role in the construction of the house in order to cut costs including assisting in frame work, building all of the decks and making sure that the house was handicap accessible. The chancellor also found that Howard was a strong father and a "jack of all trades" around the home. In fact, Mary herself testified that Howard did his best to provide for the family including; taking care of a number of things around the house.

¶56. Even the majority concedes that during their marriage:

> Mary took voluntary deductions from her monthly check which went into her own savings, a salary protection plan, and a cancer policy in addition to her health insurance. In contrast, all of Howard earnings, excepting mandatory deductions, were deposited in their joint account and used to meet the family's needs. He had no separate savings plan nor significant retirement account. Virtually all of Howard's earnings went into the building and maintenance of the home while Mary enjoyed broad deductions for her separate savings and retirement accounts.

Howard deserves an equal share of the house he helped build, at today's market value.

¶57. As to issue IV, while taking into consideration the *Armstrong* factors, *Armstrong v. Armstrong*, 618 So.2d 1278, 1280 (Miss. 1993), the chancellor was correct in refusing to grant Mary permanent periodic alimony. In fact, one wonders why Mary was granted alimony in the first place. At the first trial, Mary was awarded $600 a month in child support and an additional $400 in alimony for 36 months. All of this despite the fact that Mary, in the words of the chancellor, ended up with "significant investments, home equity and a vested retirement." Although there was some disparity in their salaries, Mary's earnings were used for health insurance, life insurance and investments solely for her retirement, while Howard's were deposited each month into their joint account and used to support the family. The remaining amount of Mary's salary was also put into the joint account. The chancellor acknowledged that Howard was at a substantial disadvantage because his income during the marriage went toward paying family and marital expenses and he was unable to amass a substantial retirement fund as Mary had done.

¶58. The chancellor was correct to deny permanent periodic alimony and order the repayment of past alimony as neither was warranted by the evidence. To hold that alimony "vests" as it comes due and is not recoverable infringes on the very right and purpose of an appeal. If some time after a chancellor renders his decision, this Court finds that alimony was erroneously granted, such a finding would be "too little, too late" as the payments would have continuously been made throughout the appeal process. Restricting an appellant's right to recover payments made pursuant to an improper order removes not only this Court's power to review the trial court's decision, but makes any appeal in such a situation impractical. The issue was kept alive, and we ordered all issues to be reviewed. The chancellor can adjust the payments, and that is exactly what he did.

¶59. Instead of playing the role of "super chancellor," the majority should send this case back and request a better finding of facts based on the record and allow redistribution with proper instructions to the chancellor to use the present market value of the house. This case should be remanded for a proper hearing on the assets at today's present value and an equal distribution, allowing Mary credit for the mortgage payments she has made on the house since separation. One can only conclude that the majority has no faith in the trial judge with its decision here at the appellate level and instead has chosen to play the role of "super chancellor." Accordingly, I dissent in part.