# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00040-COA

| | |
|---|---|
| BRANDON SMITH AND KIMBERLY WOLFE SMITH | APPELLANTS |

v.

| | |
|---|---|
| MILTON MARTIN AND GENEVA MARTIN | APPELLEES |

| | |
|---|---|
| DATE OF JUDGMENT: | 05/16/2013 |
| TRIAL JUDGE: | HON. JANACE H. GOREE |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | GEORGE S. WHITTEN JR. |
| | TOM P. CALHOUN III |
| ATTORNEY FOR APPELLEES: | JAMES H. POWELL III |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED APPELLEES' PETITION FOR GRANDPARENT-VISITATION RIGHTS |
| DISPOSITION: | AFFIRMED - 03/01/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, J., FOR THE COURT:**

¶1. Brandon and Kimberly Smith (collectively, the Smiths) appeal the Yazoo County Chancery Court's grant of grandparent visitation to Milton and Geneva Martin (collectively, the Martins). On appeal, the Smiths raise numerous issues, which we have summarized as follows: (1) whether the chancellor followed a nonjudicial philosophy that was incompatible with trying cases and controversies; (2) whether the chancellor abused her discretion by excluding certain testimony as hearsay; (3) whether the chancellor erred by finding visitation

was in the grandchildren's best interests before analyzing the *Martin*[1] factors; (4) whether the chancellor applied an erroneous legal standard that placed an improper burden of proof on the Smiths; (5) whether the chancellor improperly substituted her judgment for that of the Smiths; (6) whether the record contained substantial credible evidence to support the chancellor's findings of fact; (7) whether the chancellor erred by ordering temporary visitation prior to hearing the merits of the Martins' petition; and (8) whether the chancellor erred by ordering the Smiths to participate in family counseling with a court-appointed counselor.

¶2.    Finding no error, we affirm.

**FACTS**

¶3.    Kimberly and Marty Martin married in 1996 and divorced in 2003. The couple had two minor children. The couple's first son, Cliff,[2] was born in 2001. Their second son, Hank,[3] was born in 2004 after the entry of the divorce decree. Kimberly received physical custody of the two children, and Marty received visitation supervised by his parents, the Martins.

¶4.    On February 8, 2008, Marty committed suicide. His body was discovered at his home

---

[1] *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997).

[2] The Smiths' appellate brief uses the pseudonym Cliff to refer to Marty and Kimberly's oldest son. We likewise use this fictitious name throughout our opinion.

[3] The Smiths' appellate brief uses the pseudonym Hank to refer to Marty and Kimberly's youngest son. We likewise use this fictitious name throughout our opinion.

on the Martins' property while the two children were present for their visitation with him. Marty's mother, Geneva, testified that the children never saw their father's body but viewed the emergency personnel who responded to the situation. Following Marty's death, Kimberly allowed the Martins to continue visitation with the children as they had prior to Marty's death. The Martins' visitation included weekend visits, overnight visits, and a week of visitation around Christmas. At one point, Kimberly was hospitalized after she suffered a nervous breakdown. During this time, the Martins provided full-time care for at least one of Kimberly's children while Kimberly recovered.

¶5. On May 17, 2008, Kimberly married Brandon. In 2010, Brandon adopted Kimberly's children.[4] Following an incident on January 2, 2011, Kimberly and Brandon discontinued the Martins' visitation with the two minor children. Geneva and Kimberly both testified about the incident on January 2, 2011. The women both testified that the two children were visiting the Martins when Hank became ill. Geneva and Kimberly arranged to meet so that Hank could return home. Kimberly decided that Cliff should return home at the same time.

¶6. Geneva testified that, upon learning that he had to go home early, Cliff grew upset and began to cry. Geneva further testified that, upon arriving at the exchange location, she instructed the children to get inside Kimberly's car while she spoke to Kimberly. Geneva told Kimberly that Cliff had accused Brandon of the following: being mean to Cliff, telling

---

[4] Kimberly was married prior to her marriage to Marty. In addition to her two younger sons with Marty, Kimberly has two older sons from her first marriage. After Brandon married Kimberly in 2008, he adopted all four of Kimberly's sons.

Cliff he was overweight and needed Jenny Craig, and pulling Cliff's hair and arms until they hurt.[5]

¶7.     At this point in the story, the two women's accounts of events differed.  According to Kimberly, during the conversation, Geneva would sob hysterically, compose herself, and then continue sobbing.  Kimberly testified that Cliff, who witnessed the women's conversation from inside Kimberly's car, jumped from Kimberly's car, ran to Geneva's car, and locked himself inside.  Kimberly further testified that, as he ran toward Geneva's car, Cliff yelled, "You were right, Grandmother.  My life would be better if I just lived with you and went to school at Carroll Academy."

¶8.     Geneva, however, disputed Kimberly's version of events.  According to Geneva's testimony, she and Kimberly both remained composed during the conversation.  Geneva admitted that, when Kimberly raised her voice at one point during the conversation, Cliff exited Kimberly's car, hugged Geneva, and then ran to Geneva's car.  Geneva testified, though, that Cliff never yelled anything as he ran to her car and that he never locked himself inside her car.

¶9.     On redirect, Kimberly testified that Cliff remained upset the entire drive home after the events on January 2, 2011. Even after arriving home, Kimberly stated that Cliff remained inconsolable.  During her redirect, Kimberly testified as follows:

---

[5] The record reflects no evidence that the chancellor appointed a guardian ad litem for the minor children.

4

[Cliff] was hysterically telling me that I had lied to him, that his grandmother had told him I had lied to him his whole life; that I had divorced his daddy for no good reason, taken him away from [Marty]; [that Marty] got sadder and sadder, sicker and sicker until he died. That Brandon would never be his daddy, Brandon didn't love him; that Grandmother said [Brandon] would never love him because he wasn't [Brandon's] real child, [the adoption] was just a piece of paper; [Brandon] had no right to discipline him. He kept on and on telling me that I had lied to him, I had lied to him his whole life about this divorce. He told Brandon his grandmother said she would hire an attorney and sue us to have his name changed back to Martin.

¶10. Because Cliff remained inconsolable and refused to believe anything they told him, the Smiths asked other family members to explain to Cliff the kind of man his father, Marty, had been and to explain why Kimberly had divorced Marty. The Smiths testified that they were reluctant to take this course of action but believed it was the only way to help Cliff calm down. During a proffer, Kimberly testified that she, Brandon, her two older sons, her mother, and her aunt all spoke to Cliff. The family members explained to Cliff that Marty had experienced an ongoing drug problem; Marty had beaten Kimberly; and Kimberly had divorced Marty because she was afraid for her safety and Cliff's safety. During her direct examination, Kimberly testified that Cliff eventually calmed down after speaking to the other family members. However, because she and Brandon remained concerned, they made an appointment for a psychologist to evaluate Cliff and Hank.

¶11. Kimberly further testified that she ended the Martins' visitation with the children due in part to the events on January 2, 2011. Kimberly testified that she and Brandon also ended the visitation because they had observed a change in the children's behavior following their visits with the Martins. According to Kimberly, the children acted more aggressively and

disrespectfully after visiting the Martins. Both Kimberly and Brandon testified that Cliff even attempted to shoot Brandon with a BB gun in July 2010. Due to the cumulative effect of these incidents, the Smiths decided it was in the children's best interests to deny the Martins further visitation.

¶12. On August 3, 2011, the Martins filed a petition for grandparent visitation pursuant to Mississippi Code Annotated section 93-16-3(2) (Rev. 2013). On August 9, 2011, the Martins filed a motion for temporary visitation. Following a hearing on the Martins' motion for temporary visitation, the chancellor entered an order granting temporary visitation. The chancellor's order granted the Martins telephone visitation up to two times a week between 5:30 p.m. and 9 p.m. In addition, the chancellor granted the Martins physical visitation with the children for five hours on December 28, 2011, which was to be supervised by a mutual friend of the parties.

¶13. On May 16, 2013, following a two-day hearing, the chancellor entered an order finding that the Martins were entitled to visitation under Mississippi Code Annotated section 93-16-3(1) (Rev. 2013).[6] Because the Martins filed their petition under section 93-16-3(2),

---

[6] Section 93-16-3(1) states:

Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child.

6

however, the chancellor also discussed whether the Martins satisfied the criteria for grandparent visitation under that subsection of the statute. The chancellor determined that an award of grandparent visitation was also appropriate under section 93-16-3(2) since the Martins established the following: (1) a viable relationship existed with the children; (2) the Smiths unreasonably denied visitation; and (3) visitation was in the children's best interests. *See* Miss. Code Ann. § 93-16-3(2). Although the Smiths testified that they denied visitation for behavior-related reasons, the chancellor found no causal connection between the children's behavior and their visits with the Martins.

¶14. After determining that the Martins were entitled to visitation under both section 93-16-3(1) and section 93-16-3(2), the chancellor considered the *Martin* factors. After considering the factors, the chancellor found: (1) limited visitation would not be too disruptive to the children's lives; (2) the Martins' activities posed no barrier to their ability to provide a suitable home with sufficient supervision when the children visited; (3) the children were ages eleven and nine at the time of the hearing; (4) the Martins, both in their sixties, appeared to be in good health at the time of the hearing even though Geneva had suffered a nervous breakdown after Marty's suicide and Milton had experienced stress due to his son's death and Geneva's breakdown; (5) strong emotional ties existed between the Martins and the children; (6) no evidence was offered to prove that the Martins were morally unfit to have a relationship with the children; (7) the Martins' home in Carroll County was not too far from the Smiths' home in Yazoo County; (8) although the Smiths alleged that the

Martins undermined their general discipline of the children, they failed to offer any evidence to substantiate their claims; (9) the Martins' employment responsibilities would not interfere with visitation; and (10) the Martins testified that they were willing to accept that rearing the children was the Smiths' responsibility, and they testified that they would do nothing to interfere with that.

¶15.   The chancellor concluded that it was in the children's best interests to award grandparent-visitation rights to the Martins.  The chancellor therefore granted the Martins visitation with the children on the third weekend of every month.  The chancellor also ordered the Smiths, the Martins, and the children to attend family counseling to facilitate a smooth visitation experience between the Martins and the children.  In addition, the chancellor ordered that the family counseling would continue until the counselor determined the need for counseling no longer existed.

¶16.   Following the chancellor's order, the Smiths filed an unsuccessful motion for a new trial.  The Smiths asserted in their motion that the chancellor had erroneously excluded evidence and conducted the hearing in a manner pervasively prejudicial to them.  Aggrieved by the chancellor's grant of visitation and denial of their new-trial motion, the Smiths appeal.

## STANDARD OF REVIEW

¶17.   "'Visitation and restrictions placed upon it are within the discretion of the chancery court.'  We are 'bound to accept the findings of the chancellor unless he is manifestly wrong or there is clearly an abuse of discretion.'" *Arrington v. Thrash*, 122 So. 3d 144, 148 (¶13)

8

(Miss. Ct. App. 2013) (quoting *Martin v. Coop*, 693 So. 2d 912, 915 (Miss. 1997)). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic[-]relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000) (citation omitted). However, we review de novo questions of law. *Smith v. Wilson*, 90 So. 3d 51, 56 (¶13) (Miss. 2012).

## DISCUSSION

### I. Whether the chancellor followed a nonjudicial philosophy that was incompatible with trying cases and controversies.

¶18.    The Smiths assert that the chancellor "was driven by a philosophy that [was] not judicial at all . . . and [that was] incompatible with trying cases and controversies." The Smiths further allege that "the chancellor was determined to be [a] therapist to the parties rather than a tribunal to whom both sides present their cases . . . and who hears all the admissible, relevant evidence." The Smiths cite several statements the chancellor made throughout the hearing, and they argue these statements show the chancellor failed to admit relevant evidence and testimony unfavorable to the Martins due to her nonjudicial philosophy. Asserting that the chancellor's rulings were erroneous, the Smiths argue that their testimony and evidence was admissible to explain why they denied further visitation with the Martins and why they determined that such visitation was not in the children's best interests.

¶19.    Rule 611(a) of the Mississippi Rules of Evidence states that "[t]he court shall exercise

reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." "The standard of review for the admission or suppression of evidence in Mississippi is abuse of discretion." *Troupe v. McAuley*, 955 So. 2d 848, 855 (¶19) (Miss. 2007). "For a case to be reversed based upon the erroneous admission or exclusion of evidence, the error must result in prejudice or harm that adversely affects a substantial right of a party." *Beverly Enters. Inc. v. Reed*, 961 So. 2d 40, 44-45 (¶18) (Miss. 2007).

¶20.    Upon review, we find no merit to the Smiths' assertions that the chancellor failed to admit relevant evidence and testimony unfavorable to the Martins due to a nonjudicial philosophy. After reviewing the chancellor's rulings on the admission and exclusion of evidence, we find no abuse of discretion that resulted in prejudice or harm that adversely affected a substantial right of the Smiths. *See id.* As a result, this argument lacks merit.

II.    **Whether the chancellor abused her discretion by excluding certain testimony as hearsay.**

¶21.    The Smiths next argue that the chancellor abused her discretion by excluding as hearsay Brandon's testimony about four statements Cliff made to Brandon. The Smiths contend Cliff's statements were not hearsay because the Smiths did not offer the statements to prove the truth of the matter asserted. Instead, the Smiths argue that they offered Brandon's testimony about Cliff's statements to show the effect the statements had on the

10

Smiths and to explain why they terminated the Martins' visitation with the children. Furthermore, the Smiths claim that Cliff's statements fell within the following exceptions to the hearsay rule: (1) present-sense impressions; (2) excited utterances; (3) statements of Cliff's then-existing mental, emotional, or physical condition; and (4) statements falling withing the catch-all exception. *See* M.R.E. 803(1)-(3), (24).

¶22. As previously discussed, we review the exclusion of evidence for abuse of discretion. *See Troupe*, 955 So. 2d at 855 (¶19). Rule 801(c) of the Mississippi Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

¶23. During both Kimberly's and Brandon's direct examinations, the Smiths' attorney asked what specific statements Cliff made to them after the events on January 2, 2011. Each time, the Martins objected to the testimony as hearsay. After sustaining the Martins' objection, the chancellor excused herself from the courtroom to allow Kimberly and Brandon to each make a proffer regarding Cliff's statements. On appeal, the Smiths argue that the chancellor erred by excluding as hearsay Brandon's testimony about the four following statements Cliff made to Brandon: (1) Brandon was not Cliff's real daddy; (2) Brandon whipped Cliff every day; (3) Brandon was not Cliff's real daddy and could not spank Cliff; and (4) Kimberly had lied to Cliff his entire life.

¶24. In their brief, the Smiths acknowledge that the chancellor allowed Kimberly to testify about Cliff's statements during her redirect examination. As the record reflects, after initially

11

sustaining the Martins' hearsay objection during Kimberly's direct examination, the chancellor then allowed Kimberly to testify about Cliff's statements on redirect examination. During her redirect examination, Kimberly testified as follows:

> **[Cliff] was hysterically telling me that I had lied to him**, that his grandmother had told him I had lied to him his whole life; that I had divorced his daddy for no good reason, taken him away from [Marty]; [that Marty] got sadder and sadder, sicker and sicker until he died. **That Brandon would never be his daddy**, Brandon didn't love him; that Grandmother said [Brandon] would never love him because he wasn't [Brandon's] real child, [the adoption] was just a piece of paper; **[Brandon] had no right to discipline him**. He kept on and on telling me that I had lied to him, I had lied to him his whole life about this divorce. He told Brandon his grandmother said she would hire an attorney and sue us to have his name changed back to Martin.

(Emphasis added).

¶25. In addition to allowing Kimberly to testify about Cliff's statements on redirect, the chancellor addressed this assignment of error in her order denying the Smiths' new-trial motion. The chancellor found that the Smiths sought to admit the testimony to convince her of the truth of the matter asserted rather than to show the effect on the hearer. As a result, the chancellor found that the statements, and any testimony about them, constituted inadmissible hearsay. Despite her findings, the chancellor further stated:

> In spite of the foregoing, the [c]ourt considered many of the statements allegedly made by the [Smiths'] minor children [since] the [Smiths] prepared voluminous affidavits, which were filed in the court file. Some of these statements were contained in the affidavits, along with many other statements describing various events in the lives of these parties. Since opposing counsel did not object to these affidavits being made a part of the court file, this [c]ourt reviewed the affidavits in preparation for this case.

¶26. Although the chancellor reviewed the Smiths' affidavits and admitted Kimberly's

12

redirect-examination testimony, the Smiths still contend that the chancellor erred by excluding Brandon's proffered testimony. After reviewing the record and applicable caselaw, however, we find no abuse of discretion from the chancellor's exclusion of Brandon's testimony as hearsay. We therefore find that this argument lacks merit.

### III. Whether the chancellor erred by finding visitation was in the grandchildren's best interests before analyzing the *Martin* factors.

¶27. The Smiths next argue that the chancellor erred by "first declar[ing] visitation with the grandparents to be in the children's best interests (based on preserving the close relationship)" and by then "appl[ying] the ten [*Martin*] factors only to guide her apportionment of how much time to award." The Smiths contend that the chancellor erred because she should have analyzed the *Martin* factors before concluding that grandparent visitation served the children's best interests.

¶28. Grandparent-visitation rights are governed by statute. *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013). Mississippi's applicable statute, Mississippi Code Annotated section 93-16-3 (Rev. 2013), states:

> (1) Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child.
>
> (2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant

13

visitation rights to the grandparent, provided the court finds:

> (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and

> (b) That visitation rights of the grandparent with the child would be in the best interests of the child.

¶29. As previously stated, the Martins sought grandparent visitation under section 93-16-3(2). However, in her order granting grandparent visitation, the chancellor first discussed section 93-16-3(1). Under section 93-16-3(1) and Mississippi Code Annotated section 93-16-7 (Rev. 2013),[7] the chancellor found that the Martins were entitled to petition for grandparent visitation. The chancellor then stated, "The [c]ourt is aware that if subsection (1) of [section 93-16-3] applies, then subsection (2) need not be considered in determining whether the Martins have a right to petition for grandparent visitation[]." However, because the Martins petitioned for grandparent visitation under section 93-16-3(2), the chancellor addressed that part of the statute as well.

¶30. In addressing the Martins' petition under section 93-16-3(2), the chancellor first determined whether the Martins showed that they possessed a viable relationship with the children. The chancellor found that the Martins had exercised consistent and frequent

---

[7] Section 93-16-7 provides that "[t]his chapter shall not apply to the granting of visitation rights to the natural grandparents of any child who has been adopted by order or decree of any court unless: (a) one (1) of the legal parents of such child is also a natural parent of such child[.]"

14

visitation with the children for most of the children's lives. The testimony reflected that the Martins supervised the children's visitation with Marty and then continued visitation with the children following Marty's death. The evidence in the record established that this continued visitation included every other weekend, overnight visits, and one week of visitation around Christmas. In addition, the chancellor found that, while Kimberly was hospitalized for a nervous breakdown, the Martins provided full-time care to at least one child until Kimberly recovered. Based on the evidence presented, the chancellor found the Martins had shown the existence of a viable relationship.

¶31. The chancellor next considered whether the Smiths had unreasonably denied visitation to the Martins. The Smiths testified that they terminated the Martins' visitation due to several incidences, including the events that occurred on January 2, 2011. Kimberly also testified, however, that she and Brandon had noticed changes in the children's behavior following their visits with the Martins. The Smiths both testified that Cliff and Hank acted more aggressively and disrespectfully after visitation with the Martins and that, at one point, Cliff attempted to shoot Brandon with a BB gun.

¶32. After considering the parties' testimony and evidence, the chancellor found that the Smiths' reasons for terminating the Martins' visitation failed to show a causal connection between the children's behavior and their contact with the Martins. Based on her review of the testimony and evidence, the chancellor found that the Smiths had unreasonably denied visitation to the Martins. The chancellor then stated that the children's best interests would

be served by awarding grandparent visitation. The chancellor further stated that, to determine the extent of visitation, she must analyze the *Martin* factors. After analyzing the *Martin* factors, the chancellor again reiterated that limited visitation was in the children's best interests. As a result, she awarded the Martins visitation on the third weekend of every month.

¶33. Upon review, we find the record contains substantial credible evidence to support the chancellor's findings that the Martins were entitled to grandparent visitation. As a result, we find no abuse of discretion in the chancellor's award of grandparent visitation. *See Arrington*, 122 So. 3d at 148 (¶13). We therefore find that this argument lacks merit.

### IV. Whether the chancellor applied an erroneous legal standard that placed an improper burden of proof on the Smiths.

¶34. The Smiths assert that the chancellor failed to treat this matter as a grandparent-visitation case and instead treated the matter more like a child-custody case between two natural parents. According to the Smiths, the chancellor "elevated the Martins to the higher status of a parent[] and demoted [the Smiths] to [a] weak[er] position of one parent going up against the other parent." In so doing, the Smiths argue that the chancellor applied erroneous legal standards and improperly placed a heightened burden of proof on them.

¶35. The Smiths first contend that, instead of adhering to the best-interest-of-the-child standard, the chancellor erroneously required them to show that the Martins either posed a threat to the children or lacked the ability to adequately provide for the children's basic needs. In addition, the Smiths argue that, instead of requiring the Martins to prove they were

16

entitled to grandparent visitation, the chancellor erroneously placed the burden on the Smiths to prove that the Martins were not entitled to grandparent visitation. Due to these alleged errors, the Smiths ask this Court to reverse the chancellor's judgment.

¶36. As previously discussed, a chancellor's decisions will not be reversed when her findings of fact are supported by substantial credible evidence in the record. *See Henderson*, 757 So. 2d at 289 (¶19). Unless the chancellor was manifestly wrong or clearly erroneous or applied an erroneous legal standard, her findings of fact remain undisturbed. *Id.* at 289-90 (¶19). As also acknowledged, grandparent visitation is purely a statutory right that may only be considered where the statutory requirements are met. *Aydelott*, 124 So. 3d at 100 (¶9).

¶37. The record reflects that the chancellor first found the Martins met the statutory criteria of section 93-16-3(1). The chancellor then went a step further and analyzed the Martins' claim under section 93-16-3(2) as well. The chancellor determined that the Martins also satisfied the criteria in section 93-16-3(2) because they established a viable relationship with the children and unreasonable denial of visitation by the Smiths. As a result of her findings, the chancellor applied the *Martin* factors and determined that visitation was in the children's best interests.

¶38. After reviewing the record, we find no support for the Smiths' argument that the chancellor applied an erroneous legal standard and required them to satisfy a heightened burden of proof. Accordingly, we find that this assignment of error lacks merit.

> **V.** **Whether the chancellor improperly substituted her judgment for that of the Smiths.**

17

¶39.　The Smiths next assert that the chancellor erroneously engaged in decision making de novo and substituted her judgment for theirs instead of presuming that their denial of visitation served the children's best interests.[8] The Smiths further allege that the chancellor's failure to mention "the legal presumption that parents act in their child's best interest . . . warrants reversal."

¶40.　Mississippi caselaw clearly establishes that "the best interest of the child must be the polestar consideration" when determining the amount of grandparent visitation. *Martin*, 693 So. 2d at 916.　Our caselaw further states "that visitation granted to grandparents should not be equivalent to that which would be granted to a non-custodial parent unless the circumstances overwhelmingly dictate that it should be." *Id.*　In *Stacy v. Ross*, 798 So. 2d 1275, 1280 (¶23) (Miss. 2001), the Mississippi Supreme Court wrote:

> The determination whether parents are unreasonable in denying visitation in whole or part to grandparents is not a contest between equals.　Parents with custody have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed.　Interference with that right based upon anything less than compelling circumstances is not the intent of the visitation statute.　Clearly, forced, extensive unsupervised visitation cannot be ordered absent compelling circumstances [that] suggest something near unfitness of the custodial parents.

(Internal citations omitted).

¶41.　Although our caselaw instructs chancellors to give deference to a natural parent's

_____

[8] As part of their argument, the Smiths also allege that the chancellor substituted her judgment for theirs by condemning them for sharing the truth about Marty with Cliff instead of presuming that they acted in Cliff's best interests.

18

decision about grandparent visitation, this Court has previously stated that a chancellor is "not required to defer automatically to [the natural parent's] decision as a fit custodial parent, especially where the chancellor [finds] that visitation [is] in [the child's] best interest." *Brown v. Yates*, 68 So. 3d 758, 762 (¶20) (Miss. Ct. App. 2011). In the present case, the chancellor considered section 93-16-3's criteria, as well as the *Martin* factors, to determine whether to award grandparent visitation. After conducting her analysis, the chancellor concluded that limited visitation with the Martins was in the children's best interests. As a result, we find no merit to the Smiths' argument that the chancellor improperly substituted her judgment for theirs.

**VI.  Whether the record contained substantial credible evidence to support the chancellor's findings of fact.**

¶42.  The Smiths next challenge various findings of fact made by the chancellor. As previously discussed, however, this Court finds that the record contains substantial credible evidence to support the chancellor's findings. As a result, we decline to further address the Smiths' claims regarding this assignment of error.

**VII.  Whether the chancellor erred by ordering temporary visitation prior to hearing the merits of the Martins' petition.**

¶43.  In their next assignment of error, the Smiths argue that the chancellor erred by granting the Martins temporary visitation prior to hearing the merits of the Martins' grandparent-visitation petition. The Smiths challenge the grant of temporary visitation because they contend that the chancellor's error could be repeated if this Court reverses the

19

chancellor's judgment and remands the case to chancery court. However, because this Court affirms the chancellor's judgment, we decline to address this assignment of error.

## VIII. Whether the chancellor erred by ordering the Smiths to participate in family counseling with a court-appointed counselor.

¶44. In their final assignment of error, the Smiths argue that the chancellor exceeded her power by ordering them to undergo family counseling with a court-appointed counselor. The Smiths assert that the chancellor's jurisdiction was limited to granting the Martins grandparent visitation, and they argue that the chancellor erred by "order[ing] [them] to submit to counseling [and by] placing them under the control of a person with whose advice they might not agree." The Smiths further argue that, in determining the issue of grandparent visitation, the chancellor failed to "acquire plenary jurisdiction over the [Smiths] to order them to attend parenting classes, counseling sessions, or refrain from speaking to their children on a certain subject."

¶45. In granting visitation to the Martins, the chancellor indeed ordered the Martins, the Smiths, and the grandchildren to "attend family counseling, beginning during the month of June 2013[,] and continue until the counselor determines counseling is no longer needed." The chancellor's order also provided, however, that the purpose of the family counseling was to "facilitat[e] a smooth visitation experience between the children and their grandparents." Upon review, we find no evidence to show that the chancellor's order exceeded her authority. As a result, we find that this argument also lacks merit.

¶46. **THE JUDGMENT OF THE YAZOO COUNTY CHANCERY COURT IS**

20

**AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR AND WILSON, JJ., CONCUR. JAMES AND GREENLEE, JJ., NOT PARTICIPATING.**