FAIR, J.,
for the Court:
¶ 1. Allison Arrington appeals the Rankin County Chancery Court’s judgment granting grandparents’ visitation to Doyle and Rebecca Thrash. This is a “factor case,” a chancery court matter requiring discussion of the facts in the context of certain enumerated factors. Mar *146 tin v. Coop[1] established that ten such factors must be addressed on the record in all grandparent visitation cases brought under Mississippi Code Annotated section 93-16-3 (Supp.2012). However, the “Martin factors” are not to be weighted and are not all-inclusive; Martin calls on a chancellor to also “weigh all circumstances and factors he feels to be appropriate.” Id.
¶ 2. In this case the grandparents were awarded extensive visitation comparable to that which would ordinarily be awarded to a noncustodial parent. Allison, the child’s mother, raises three issues on appeal. She contends the chancellor erred (1) in úsing the ten Martin factors to determine whether the Thrashes were entitled to grandparent visitation; (2) in awarding excessive visitation to, the Thrashes under Martin; and (3) in changing the child’s surname. We affirm the grant of visitation to the grandparents, but we find no authority to change the birth certificate and reverse and render as to that issue only.
FACTS
¶ 3. On September 3, 2005, Jonathan Thrash, the nineteen-year-old son of Doyle and Rebecca Lynn Thrash, was cleaning up Hurricane Katrina debris at his parents’ home with a “Bobcat” when it turned over, killing him.
¶ 4. A very short time later the Thrashes were contacted by Allison Arrington, who told them that Jonathan was the father of her daughter Payton, born in late April 2005. She said she had not told Jonathan, claiming he died not knowing of the existence of his child. It was the first time the Thrashes had heard of the existence of Allison or Payton. A DNA test, proposed and paid for by the Thrashes, confirmed Allison’s representations of paternity, and a relationship began between Allison, Pay-ton, and the Thrashes.
¶ 5. Beginning when Payton was four months old, the Thrashes regularly kept her in their home on weekends and holidays, sometimes for a week or more at a time. Notably, at the very beginning of their relationship with Payton, they had her in their custody during the Thanksgiving holiday weekend of 2005, when they took six-month-old Payton, as well as Allison, to visit Payton’s great-grandparents in Tennessee. At one point Payton was in her grandparents’ home almost continuously for nearly a year. Over the four and a half years the Thrashes had custodial visitation, Allison gave birth to two other illegitimate children. The Thrashes took Payton, her younger siblings, and Allison on an occasional vacation trip together. The Thrashes contributed financially to Payton’s support and aided in obtaining Jonathan’s Social Security benefits for Payton, paying money owed by Jonathan to the Social Security Administration. Also, they set up a room in their home exclusively for Payton and had birthday and holiday parties for her each year. The extent of their involvement with their granddaughter and her mother is recorded in great detail in family calendars beginning in 2006, and in a “baby book” they call their “mamaw and papaw book.” At the hearing, the Thrashes introduced a photograph of their first meeting with Payton when she was four months old, along with a number of photographs chronicling their contacts with Payton over the years. The chancellor found specifically that the relationship between Payton and her grandparents was a “viable” one. See Miss.Code Ann. § 93 — 16—3(2)(a).
*147 ¶ 6. On May 18, 2010, just after Payton’s fifth birthday, Allison cut off her visitation with the Thrashes. Doyle Thrash had recently contacted the Mississippi Department of Human Services concerning Pay-ton and her two siblings. On a regular visitation day, Doyle had gone to Allison’s residence where she lived with “Bull,” her boyfriend and the father of her two other children. Payton told her grandfather through the window, “I can’t get Mommy up. She won’t come to the door.” Doyle testified at the hearing that, on that day, Allison seemed to Doyle to be incapacitated by substance abuse. Doyle had rung her doorbell for over thirty minutes before she finally came to the door. He testified that, on an earlier occasion, he had observed Allison’s two younger children playing in their own feces. Allison sent the Thrashes a series of text messages informing them they would not see Payton again because of the “stunt” Doyle “pulled” by calling DHS. DHS later advised him that Allison had surrendered custody of Payton and her two other children to their maternal grandmother and entered treatment for drug and alcohol abuse.
¶ 7. In September, after being denied contact with Payton since May, the Thrashes filed this action for grandparent visitation, which also sought to change Payton’s surname to that of her father.
¶ 8. Rule 81 process[2] was served on Allison on October 1, 2010, for a hearing on Monday, November 29, 2010. Her attorney filed a motion for a continuance on November 24, claiming she was required to attend a hearing elsewhere. When the court and counsel for the Thrashes discovered the motion in the court file, the court called the attorney’s office and was advised by her staff that they had no idea where she was. Nothing in the record indicates the motion was ever heard or granted, and an extensive hearing took place on the date set without Allison or her counsel present, resulting in sixteen pages of on-the-record Martin factor discussion in the fifty-five-page hearing transcript.
¶ 9. At the hearing the Thrashes testified extensively of a close and viable relationship with Payton spanning most of her life. Following their testimony, the chancellor adjudicated their status as grandparents entitled to visitation on two independent statutory grounds because (1) their child was deceased and (2) they also had an established, close relationship with their grandchild. In his extended discussion on the record, the chancellor addressed each of the Martin factors, finding that “each and every factor favors an award of grandparents visitation” to the Thrashes. He then awarded them “Farese visitation” — the same visitation that would generally have been accorded to a parent — and also ordered the change of Payton’s birth certificate by addition of Jonathan’s name as her father and the change of her surname from Arrington to Thrash.
¶ 10. Pertinent to this court’s jurisdiction under a timely notice of appeal is that, on December 6, 2010, Allison filed what we consider to be a Rule 59 motion. It remained pending for two years during which time other motions, temporary orders, agreed orders, conferences of counsel and parties (and on occasion with the court, followed by announcements and rulings on the record, one of which included the grant of grandparent visitation to Pay-ton’s maternal grandmother), and contested hearings before the chancellor took place, until the December 2010 motion was finally denied on December 11, 2012. Allison, represented by new counsel when the *148 denial was entered, filed her notice of appeal on January 5, 2012.
¶ 11. Payton was five years old when this litigation commenced, was less than four months from turning age seven when it was appealed, and is now eight years old. The surname she has been using since December 2010 does not appear of record.
¶ 12. The three issues submitted on appeal relate only to determinations made at the November 2010 hearing. Allison contests the chancellor’s award of extensive visitation in light of Martin’s call for “overwhelming” factor support of such an award, as well as the change of Payton’s surname on her birth certificate. Allison neither asserts nor argues any other error in any other ruling made by the chancellor after that November 2010 hearing. She does not object in this appeal to the hearing taking place on the return date and in her absence. The chancellor had denied from the bench a continuance motion, discovered in the court file on the day of hearing, the Monday after Thanksgiving. It had been filed in the afternoon of the Wednesday before the holiday, and Allison had been on notice for fifty-nine days prior to the hearing through service on her of a Rule 81 summons on October 1. The chancellor held that neither he, his office, the attorney for the Thrashes, nor the Thrashes had received any notice of the filing of the motion until they arrived in court for the hearing. The chancellor directed a call by his office to Allison’s counsel, whose office staff advised her whereabouts were unknown.
STANDARD OF REVIEW
¶ 13. In the seminal grandparent visitation case, Martin v. Coop, 693 So.2d 912, 915 (Miss.1997), acknowledged by both sides as controlling, the Mississippi Supreme Court held: “[Vjisitation and restrictions placed upon it are within the discretion of the chancery court.” We are “bound to accept the findings of the chancellor unless he is manifestly wrong or there is clearly an abuse of discretion.” Id.
DISCUSSION
1. Grandparent Visitation
¶ 14. Allison admits in her brief that “pursuant to statute, the Thrashes are entitled to have periods of visitation with Payton.” However, she posits as her first asserted error that the chancery court erred in using the Martin factors to determine whether the Thrashes were entitled to visitation at all, claiming that those factors are only to be used to determine the amount of visitation, after entitlement to visitation has been found appropriate.
¶ 15. Though her assertion is somewhat confusing, her argument seems to be that the chancellor made the right decision in awarding some visitation but that he made it in the wrong way and in the wrong amount. The discussion that follows will address the grandparent visitation statutes, application of the Martin factors in context of those statutes, and, in particular, the heightened consideration of facts under those factors when visitation approaching that normally accorded a parent is found possible or appropriate.
¶ 16. Mississippi Code Annotated section 93-16-3(1) states:
Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child’s parents may petition the court in which the decree or order was rendered or, in the case of the *149 death of a parent, petition the chancery-court in the county in which the child resides, and seek visitation rights with the child.
Subsection (2) further provides:
Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
(a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
(b) That visitation rights of the grandparent with the child would be in the best interests of the child.
¶ 17. The chancellor stated that before determining the extent of the visitation to be awarded, if any, he must first determine whether the issue of grandparent visitation, a purely statutory concept, was properly before him. He said:
Before the Court can award grandparents’ visitation rights, it must first do an analysis ... utilizing the factors enumerated in the case of Martin v. Coop, 693 So.2d 912, a Mississippi 1997 case.
[[Image here]]
The first factor I’m to consider — well, I guess before I should start on those, I should note for the record that this ... situation ... would fall under Mississippi Code Annotated [section] 93-16-3 subpart (1), but I could also consider it under subpart (2) as well. Subpart (1) of [section] 93-16-3 relates to a situation where there’s been a termination of parental rights or ... the death of the natural father. Subpart (2) is referred to as the viable relationship subsection. It does not necessarily require a showing of termination of parental rights or the death of the natural father. Either way[,] I’m obligated to do this analysis.
¶ 18. Having established the threshold entitlement of the Thrashes to bring this action, the chancellor then extensively discussed, as provided in Martin, whether visitation would be in Payton’s best interest.
¶ 19. Martin sets out ten factors for a chancellor to consider and discuss in determining both whether to award grandparent visitation and then, if it is awarded, its extent. As for extent, Martin emphasizes that “[grandparents do not stand in lieu of or in the shoes of the' deceased parent.” Martin, 693 So.2d at 915-16. Further, the court stated that “visitation granted to grandparents should not be equivalent to that which would be granted to a non-custodial parent unless the circumstances overwhelmingly dictate that it should be.” Id. at 916 (emphasis added). The Martin court again reiterated that “[t]he visitation should be less than that which would be awarded to a non-custodial parent, unless the circumstances overwhelmingly] dictate that that amount of visitation is in-the best interest of the child, and it would be harmful to the child not to grant it.” Id. (emphasis added).
¶ 20. The issue, then, is whether, under the facts of this case, the chancellor exceeded his discretion by awarding liberal visitation similar to what would be customarily awarded to a parent.
¶ 21. That the chancellor was aware of Martin and its restrictions is obvious on the record as quoted above. The chancellor nevertheless awarded eighty days of weekend and summertime visitation, plus extensive holiday visitation, to the Thrashes. That is an award similar to that which *150 the supreme court had reversed in Martin (eighty-one days in odd- and eighty-six days in even-numbered years).
¶ 22. The chancellor in Martin, however, had made his award specifically because of, and not despite, the fact that it was the “same visitation that he would award to a non-custodial parent.” See id at 915-16. Without the benefit of the supreme court’s guidance, he had viewed such an award to be the intent of the grandparent visitation statute. The Martin decision clarified that “equivalent visitation” was not a starting point, but that it could be an ending point only in appropriate cases. See id at 916. The chancellor in today’s case decided that this is one of those cases.
¶ 23. In later decisions citing Martin, our supreme court has continued to hold that “making findings of fact under the Martin factors is an integral part of a determination of what is in the best interest of a child.” T.T.W. v. C.C., 839 So.2d 501, 505 (¶ 12) (Miss.2003). On that basis, “the Martin factors are to be applied and discussed in every case in which grandparent visitation is an issue. Furthermore, when a chancellor finds that there are circumstances that ‘overwhelmingly dictate’ that a grandparent should be awarded equivalent visitation to that of a parent, those findings must be fully discussed on the record.” Townes v. Manyfield, 883 So.2d 93, 97 (¶ 29) (Miss.2004) (citation omitted).
¶ 24. In this case, the chancellor applied all ten Martin factors and fully discussed on the record his reasons for awarding enhanced or equivalent visitation to the Thrashes, though he did not use phrases like “equivalent visitation” or “more than usual” in doing so. In his discussion the chancellor did enumerate the facts set out above and discussed the Thrashes “keeping the baby for significant periods of time” in the past, as well as the child’s age and anticipated school attendance. He further cited the grandparents’ exceptional presence in her life during pri- or and current “formative years,” and the fact that he sees “no present reason to disrupt or stop” the “viable relationship” that was “already established between this child and her paternal grandparents.” Questioning the grandparents himself from the bench and discussing it on the record, the chancellor determined that the Thrashes understood clearly that they would not undermine Allison’s discipline of Payton, reciting that both Doyle and Rebecca “clearly understand that Allison remains the captain of the ship insofar as the rearing of Payton is concerned and that they shall defer to her on decisions such as healthcare, education, [and] spiritual upbringing. ...”
¶ 25. The facts in this case contrast with those in Martin in two critical aspects — the mother’s substance abuse and the amount of time regularly spent by Payton with her grandparents from infancy to kindergarten age. In addition, in Martin the mother had remarried and was in an “intact nuclear family.” That is not true in this case.
¶ 26. The record shows that Allison had a history of substance abuse and had neglected her children. Doyle Thrash testified to the incident that triggered this litigation — when he went to pick up Payton and Allison was unable to come to the door for half an hour, as described in more detail above. Doyle’s reporting of the incident to DHS led to Allison terminating the Thrashes’ contact with Payton, whom Allison had surrendered along with her two other illegitimate children to Allison’s mother when Allison sought treatment for substance abuse, according to DHS. The record also revealed that Payton had lived with the Thrashes for a significant portion *151 of her life — at one point “most of the time for most of an entire year.” The Thrashes had also taken Payton, and on more than one occasion her mother and siblings, with them on trips.
¶ 27. In his discussion of the Martin factors, the chancellor found that “based upon uncontradieted evidence, [the Thrashes] have participated extensively in the life of [Payton] since she was approximately four and a half months old.” The chancellor recognized that he was awarding greater than usual grandparent visitation, but expressly found it to be in Pay-ton’s best interest under the unique facts of this case. We find he was within his discretion in doing so.
2. Changing the Child’s Surname
¶ 28. Finally, Allison argues that the chancellor erred in adjudicating:
[T]he Mississippi Department of Vital Statistics should be, and hereby is, ordered and directed to amend the birth certificate of Payton Makenzie Arring-ton, a female child born April 26, 2005, to reflect the name of her natural father as Jonathan Eric Thrash and further to change the name of said minor child to Payton Makenzie Thrash.
¶ 29. Mississippi Code Annotated section 41-57-23 (Supp.2012) provides that any pleading filed in the chancery court to change a birth certificate, “including, changes or additions to a birth certificate resulting from a legitimation, filiation or any changes not specifically authorized elsewhere,” including specifically the surname of a child, shall name the State Board of Health as a respondent. The petitioner must also send a certified copy of the pleading to the State Board of Health and/or serve process on the State Registrar of Vital Records. Answer by the State Board of Health is mandated.
¶ 30. The statute excepts adoption cases, which are also expressly excepted under the adoption proceedings statutes, Mississippi Code' Annotated sections 93-17-1 to -31 (Rev.2004 & Supp.2012). Paternity proceedings under Mississippi Code Annotated section 93-9-1 to -49 (Rev.2004 & Supp.2012) likewise allow for an exception. Those statutes provide for child support cases, which are generally initiated by DHS; but which may also be initiated by “the mother, or father, the child, or any public authority chargeable by law with the support of the child.”
¶ 31. There is no authority in the grandparent visitation statutes, Mississippi Code Annotated section 93-16-1 to -7 (Rev.2004 & Supp.2012), for change of a birth certificate, nor can we find any general- statute addressing the change of the name of a minor child on a birth certificate without the inclusion of the State Board of Health as a necessary party, other than the two exceptions noted above.
¶ 32. Accordingly, since section 41-57-23 applies, we must reverse the decision of the chancellor changing Payton’s surname on her birth certificate.
¶ 33. THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART AS TO THE CHANGE OF NAME. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANT AND THE APPELLEES. .
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J„ CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., *152 CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J.

. Martin v. Coop, 693 So.2d 912, 916 (Miss.1997), was most recently reviewed and discussed by our highest court in Smith v. Wilson, 90 So.3d 51 (Miss.2012).

. M.R.C.P. 81.