# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00226-COA

| | |
|---|---|
| **DALPHANIE LOFTON AND PATRICK JOHNSON** | **APPELLANTS** |

v.

| | |
|---|---|
| **RUBY N. LOFTON** | **APPELLEE** |

| | |
|---|---|
| DATE OF JUDGMENT: | 02/11/2014 |
| TRIAL JUDGE: | HON. JOE DALE WALKER |
| COURT FROM WHICH APPEALED: | SIMPSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JEANINE M. CARAFELLO |
| ATTORNEY FOR APPELLEE: | RUBY N. LOFTON (PRO SE) |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | AWARDED VISITATION TO GRANDMOTHER |
| DISPOSITION: | AFFIRMED: 10/20/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, P.J., FOR THE COURT**:

¶1.    Ruby Lofton filed a petition for grandparent visitation in Simpson County Chancery Court. Ruby sought visitation with her daughter's child, Lauren.[1] The chancellor awarded visitation to Ruby. Dalphanie Lofton and Patrick Johnson, Lauren's mother and father, appeal. We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Lauren was born in January 2010. From January 2010 to October 2012, Lauren and

---

[1] To protect the privacy of the minor child, this Court uses a fictitious name.

Dalphanie lived with Ruby. While Dalphanie worked, Ruby and her mother, Bobbie Nell Lofton, looked after Lauren. During this time, Ruby also provided periodic financial assistance to Dalphanie and Lauren.

¶3. Prior to October 2012, Ruby and Bobbie Nell took Lauren to the emergency room on two separate occasions. As a result of these two visits, the Department of Human Services (DHS) opened two investigations of Patrick. A no-contact order went into place but was rescinded in October 2012, after which Dalphanie and Lauren moved in with Patrick.

¶4. After this move, Dalphanie prevented Ruby from seeing Lauren. Ruby subsequently filed a petition for grandparent visitation on April 22, 2013. The chancellor held a hearing on January 23, 2014. The chancellor found that visitation was in Lauren's best interests and awarded visitation. The order, entered on February 11, 2014, stipulated to two afternoon visits that progressed to one overnight visit a month, and finally to one weekend visit per month. Dalphanie and Patrick appeal this judgment.

STANDARD OF REVIEW

¶5. "'Visitation and restrictions placed upon it are within the discretion of the chancery court.' We are 'bound to accept the findings of the chancellor unless he is manifestly wrong or there is clearly an abuse of discretion.'" *Arrington v. Thrash*, 122 So. 3d 144, 148 (¶13) (Miss. Ct. App. 2013) (citation omitted). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Walley v. Pierce*, 86 So. 3d 918, 920 (¶8) (Miss. Ct. App. 2011) (quoting *Henderson v.*

*Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)). But "[w]hen reviewing a chancellor's interpretation and application of the law, our standard of review is de novo.*" Vaughn v. Vaughn*, 56 So. 3d 1283, 1288 (¶17) (Miss. Ct. App. 2011) (citing *Tucker v. Prisock*, 791 So. 2d 190, 192 (¶10) (Miss. 2001)).

ANALYSIS

*A.     Merits of the Appeal*

¶6.     Dalphanie and Patrick argue on appeal that: (1) Ruby did not prove that Dalphanie and Patrick unreasonably withheld visitation, and (2) Ruby failed to meet her burden to show visitation was in Lauren's best interests. In her pro se brief, Ruby counters that the chancellor did not err in his findings.

¶7.     Mississippi Code Annotated section 93-16-3(2) (Rev. 2013) establishes the framework for grandparent visitation. A grandparent may petition for visitation "when [she] has shown: (1) that a 'viable relationship' with [her] grandchild has been established, (2) that visitation with the grandchild has been unreasonably denied by the grandchild's parent, and (3) that visitation is in the best interest of the grandchild." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citing Miss. Code Ann. § 93-16-3(2)).

¶8.     To prove a viable relationship, a grandparent must show "[she has] voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months . . . [and] had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year." Miss. Code. Ann. § 93-16-3(3) (Rev. 2013). The parties agree that Ruby and Lauren have a viable relationship. Lauren and

3

Dalphanie lived with Ruby for over two and a half years. Ruby also provided some financial support to Lauren during this time. The parties dispute, however, that Dalphanie and Patrick unreasonably denied visitation.

¶9. Dalphanie and Patrick contend that they did not unreasonably deny visitation because Ruby never requested to see Lauren. However, testimony showed that circumstances interfered with Ruby's ability to visit Lauren. First, Ruby testified that Dalphanie changed her phone number and ceased communication with Ruby. Additionally, Ruby, Dalphanie, and Patrick also testified about an incident at Dalphanie and Patrick's apartment complex, which resulted in Ruby's banishment from the complex. Ruby also testified that when she saw Lauren in town, whoever was with her would keep Ruby from approaching her. Thus, the evidence indicated that Ruby could not easily request visitation.

¶10. Alternatively, Dalphanie and Patrick argue that if they did deny Ruby visitation, it was reasonable. At the hearing, Dalphanie and Patrick testified they denied visitation because Ruby and Bobbie Nell initiated the two DHS cases against Patrick. Dalphanie and Patrick admitted, however, that while they believed Ruby and Bobbie Nell reported Patrick, they had no proof. Further, Ruby and Bobbie Nell testified that neither of them filed a complaint with DHS against Patrick.

¶11. "The determination whether parents are unreasonable in denying visitation in whole or part to grandparents is not a contest between equals. Parents with custody have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed." *Stacy v. Ross*, 798 So. 2d 1275, 1280 (¶23) (Miss. 2001) (citations

4

omitted). In *Stacy*, the Mississippi Supreme Court found the record did not support the chancellor's findings that the parents unreasonably denied visitation. *Id.* at 1282 (¶29). The supreme court found the circumstances did not justify the extent of the visitation ordered by the chancellor. *Id.*

¶12. Unlike in this case, however, the parents in *Stacy* were willing to allow some form of visitation. *Id.* at (¶28). Here, Dalphanie and Patrick denied all visitation. Further, the chancellor found that based on their assumptions, Dalphanie and Patrick prevented any visitation with Lauren. The chancellor concluded that Dalphanie and Patrick's belief that Ruby and Bobbie Nell reported to DHS was unfounded and, therefore, unreasonable. As such, the chancellor did not err in finding Dalphanie and Patrick unreasonably denied visitation.

¶13. Lastly, Dalphanie and Patrick argue the chancellor erroneously found that visitation with Ruby was in Lauren's best interests. To determine whether grandparent visitation is in the best interests of the child, the chancellor must consider the factors set forth by *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997). The *Martin* factors include:

1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.

2. The suitability of the grandparents' home with respect to the amount of supervision received by the child.

3. The age of the child.

4. The age, and physical and mental health of the grandparents.

5

5.    The emotional ties between the grandparents and the grandchild.

6.    The moral fitness of the grandparents.

7.    The distance of the grandparents' home from the child's home.

8.    Any undermining of the parent's general discipline of the child.

9.    Employment of the grandparents and the responsibilities associated with that employment.

10.   The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

*Id.* The *Martin* court continued: "[N]one of these factors should receive more weight in the chancellor's analysis than any other. These factors are further not all-inclusive. The chancellor should weigh all circumstances and factors he feels to be appropriate." *Id.*

¶14.   Dalphanie and Patrick allege the chancellor failed to make a proper finding as to all of the *Martin* factors. Specifically, they argue the chancellor failed to address the first two factors: whether visitation would disrupt Lauren's life, and whether Ruby's home was suitable.

¶15.   The chancellor detailed his findings of the *Martin* factors at the conclusion of the hearing. The chancellor specifically found that Lauren's age of four favored an interaction with Ruby, Ruby was in good health and only fifty years old, Ruby and Lauren likely shared emotional ties, Ruby lived only ten miles from Lauren, and Ruby had worked in steady employment for the previous ten years and rarely worked weekends. Though there was some testimony questioning Ruby's moral fitness, the chancellor found the evidence was insufficient to show she was morally unfit. Further, Ruby testified she would uphold the

6

parents' reasonable discipline of Lauren and not interfere with the parenting of Lauren. These factors favored visitation.

¶16.  The chancellor did, however, fail to address whether the visitation would be disruptive or if Ruby's home was suitable. "This Court has held that 'making findings of fact under the *Martin* factors is an integral part of a determination of what is in the best interests of a child.'" *Townes v. Manyfield*, 883 So. 2d 93, 96 (¶18) (Miss. 2004) (quoting *T.T.W. v. C.C.*, 839 So. 2d 501, 505 (¶12) (Miss. 2003)). "However, it is presumed on appeal that the chancellor has taken all factors into consideration." *T.T.W.*, 839 So. 2d at 505 (¶11).

¶17.  The supreme court reversed and remanded in both *Townes* and *T.T.W.* because the chancellors failed to sufficiently consider all of the *Martin* factors. *Townes*, 883 So. 2d at 97-98 (¶30); *T.T.W.*, 839 So. 2d at 506 (¶17). In *Townes*, the supreme court found the record lacked any consideration by the chancellor of the *Martin* factors. *Townes*, 883 So. 2d at 97 (¶28). Further, the chancellor in *T.T.W.* failed to consider nine of the ten factors. *T.T.W.*, 839 So. 2d at 505-06 (¶13).

¶18.  In *Morgan v. West*, 812 So. 2d 987, 992 (¶14) (Miss. 2002), the supreme court found the chancellor failed to adequately address six of the ten factors, including disruption to the child and the suitability of the grandparent's home. The supreme court's analysis of these two factors illustrated the deficiencies in the chancellor's findings. *Id.* at 992-93 (¶¶15-17).

¶19.  The supreme court found the chancellor improperly considered the disruption factor because the custodial parent, the noncustodial parent, and the grandparent lived in three separate parts of the state, and the parents objected to the disruption in the child's life due

to the extensive travel involved. *Id.* at 993 (¶16). In contrast, Ruby and Dalphanie lived only ten miles apart, both of Lauren's parents lived together, and Ruby's visitation would not interfere with Lauren's activities. The *Morgan* court also raised concerns of whether the grandparent home was suitable when the parent had not met the grandparent's new husband. *Id.* at (¶17). Here, Ruby lives with another daughter and grandchild, the home contains four bedrooms and three bathrooms, and Lauren would stay in the same room as when she and Dalphanie lived with Ruby. These two factors favored visitation.

¶20. Unlike in *Townes*, *T.T.W.*, and *Morgan*, the chancellor here clearly considered the majority of the *Martin* factors. Though the chancellor did not make specific findings on the two factors discussed above in his analysis, the testimony was sufficient to conclude that the chancellor considered all of the factors in his decision. Therefore, the chancellor did not err in applying the *Martin* factors, and the award of grandparent visitation was in Lauren's best interests. We affirm.

### B. Jurisdiction

¶21. The dissent addresses the issue of jurisdiction, which neither party raised. The dissent would vacate and remand the chancery court order, finding the chancery court did not have jurisdiction. We disagree.

¶22. Ruby brought a pro se[2] petition for grandparent visitation against Dalphanie and Patrick. Ruby alleged that Dalphanie and Patrick were the "birth parents" of the child. Dalphanie and Patrick were represented by Jeanine Carafello, and because this was a

---

[2] One week after the petition was filed, attorney Wesley Broadhead entered an appearance on behalf of Ruby. Ruby filed a pro se appellee's brief.

8

Mississippi Rule of Civil Procedure 81 matter, no answer was filed.

¶23. The record contains sufficient evidence to establish the chancery court's jurisdiction. Considering the record in the order of the witnesses presented, Ruby testified to the following on cross-examination by Carafello:

> Q. . . . [Y]ou've been adamant in your testimony that you will not recognize that – despite your sworn petition – that Mr. Johnson is your granddaughter's natural biological father; is that fair to say?
>
> A. Excuse me, now.
>
> Q. Your whole testimony today, you have refused and fought like a cat and dog to not have to say that Mr. Johnson is [Lauren]'s dad; is that fair to say?
>
> A. He don't know. And I don't either.
>
> Q. Okay. All right. So despite the animosity between you and Mr. Johnson and the previous escapades and fights and cops and whatnot, you're not even willing to tell [Lauren] that Mr. Johnson is her daddy, are you?
>
> A. I'm not what now?
>
> Q. You're not willing to even tell your own granddaughter that Mr. Johnson is her own daddy, are you?
>
> A. I don't know if he is her daddy or not.
>
> Q. And you think that that's in her best interest? Yes or no[?]
>
> A. She's calling a man daddy that she don't even know is her daddy. I feel like that's her mom's place to let her know whether that's her real daddy or not, but she don't know.

Ruby then testified to the following on redirect by Broadhead:

> Q. You don't know whether or not Dalphanie has had a paternity test done with Patrick Johnson and [Lauren,] do you?

9

A.    Not as far as I know.

Q.    You just don't know, do you?

A.    I just don't know.

Just before taking a lunch break, the following discussion occurred:

Court:        . . . [B]ut let me ask y'all both while we [are] on the record.  Do y'all have any DNA test or anything to show that Mr. Johnson is [Lauren]'s father?  Has that been done?

Carafello:    I have nothing.  No.

Court:        I just wanted to know if something had been done and if we know he is.  I know he's a party to this.

Carafello:    Yes.

Court:        Because he's listed as a party.  But we don't know whether there is a DNA test that he is the father or not?

Carafello:    No.  They said that there is none.  No.

Court:        And someone else is listed on the birth certificate, right?

Carafello:    Yes, Your Honor.

Court:        And he has been determined not to be the daddy of the child by a DNA test; is that correct?

Carafello:    Yes, Your Honor.

Court:        Is anybody paying child support on this child?

Dalphanie:    He is.

Court:        Is there a Court order for him to pay child support on this child?

Carafello:    Out of this Court.

Court:        Where is a copy of that order?

10

Carafello:    I don't have a copy of it. There's a copy of it downstairs, Your Honor.

Court:        Will you get it here in this lunch break, if you can. If you need additional time, there's no problem. I would just like to see that, to see if there has been an adjudication.

Carafello:    Yes.

Court:        Or if for some reason other than adjudication he's paying child support. Okay?

Carafello:    Yes, Your Honor, I will do that.

After the lunch break, the following occurred:

Broadhead:    . . . Your Honor, for the record during the break, Ms. Carafello went and pulled the court file from the Department of Human Services as it relates to Mr. Johnson.

Court:        [Examines File.] Have you looked at this?

Carafello:    Yes, Your Honor.

[OFF-THE-RECORD DISCUSSION AT THE BENCH.]

Court:        Go ahead.

Broadhead:    Judge, can the parties for the record state on the record that we're not challenging paternity and there is an order in the court file. From Ruby Lofton. We see that order in the court file and are not challenging it.

Carafello:    Yes, Your Honor. On behalf of Mr. Patrick Johnson, we're not challenging the December 20, 2010 judgment determining paternity and other relief in cause number 10-397.

Court:        So we're both on the record, and for and on behalf of your clients, you're saying they're not challenging it?

Carafello:    Yes, Your Honor.

11

¶24. Dalphanie then testified to the following questioning on direct examination by Carafello:

Q. Who lives with you?

A. My daughter . . . and Patrick.

Q. And Patrick is [Lauren's] biological father?

A. Yes, sir. Yes, [m]a'am.

¶25. Patrick then testified to the following questioning on direct examination by Carafello:

Q. Who lives with you?

A. Dalphine Lofton and [Lauren].

Q. And are you the biological father of [Lauren]?

A. Yes, [m]a'am.

¶26. Mississippi Code Annotated section 93-16-1 (Rev. 2013) provides: "Any court of this state which is competent to decide child custody matters shall have jurisdiction to grant visitation rights with a minor child . . . to the grandparents of such minor child . . . as provided in this chapter." Section 93-16-3(2) controls whether Ruby may obtain visitation rights. Mississippi Code Annotated section 93-16-5 (Rev. 2013) dictates who must be made a party to a grandparent-visitation action. Section 93-16-5 reads:

> All persons required to be made parties in child custody proceedings or proceedings for the termination of parental rights shall be made parties to any proceeding in which a grandparent of a minor child or children seeks to obtain visitation rights with such minor child or children; and the court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child. Whenever visitation rights are granted to a grandparent, the court may issue such orders as shall be necessary to enforce such rights and may modify or

12

terminate such visitation rights for cause at any time.

¶27. To terminate parental rights, Mississippi Code Annotated section 93-15-107(1) (Rev. 2013) requires the following be parties: "the mother of the child, the legal father of the child, and the putative father of the child, when known." The dissent does not specifically state who Ruby Lofton should have previously joined or must join on remand. However, the dissent's opinion implies that Fredrick Thornton is the "legal" or "putative" father who must be joined for the chancery court to have proper jurisdiction. The dissent recognizes that Fredrick was listed on Lauren's birth certificate, which is not in the record, as her father, and that he ended the relationship with Dalphanie and Lauren when he learned he was not her biological father.

¶28. We do agree with the dissent that Ruby's testimony did not establish jurisdiction. She said she did not know who Lauren's father was. However, Dalphanie's and Patrick's testimonies, which were elicited by their own attorney, confess that they are Lauren's mother and father. Further, they are the two individuals who control the custody of Lauren. There was no evidence that Fredrick asserted any rights whatsoever as Lauren's parent. We find that the chancery court had jurisdiction under section 93-16-5.

¶29. **THE JUDGMENT OF THE CHANCERY COURT OF SIMPSON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**IRVING, P.J., BARNES, ISHEE, MAXWELL AND WILSON, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., FAIR AND JAMES, JJ.**

**CARLTON, J., DISSENTING:**

13

¶30. I respectfully dissent from the majority's opinion. Mississippi statutory law and caselaw establishes that a minor child's parents, whose parental rights have not been terminated, constitute necessary parties to a proceeding for grandparent visitation. *See Bolivar v. Waltman*, 85 So. 3d 335, 337 (¶¶7-9) (Miss. Ct. App. 2012); Miss. Code. Ann. § 93-15-107 (Rev. 2004); Miss. Code Ann. § 93-16-5 (Rev. 2004). During the chancery court hearing on Ruby's petition for grandparent visitation, testimony revealed that the child's biological father is unknown. Furthermore, the record is ambiguous as to the identity of the child's legal father.

¶31. I find the record fails to reflect that all the necessary parties were served notice and joined in this action. Without proper joinder of, and notice by service of process to, all the necessary parties to this action, including the child's father, the chancellor lacked jurisdiction to award grandparent visitation. *See Bolivar*, 85 So. 3d at 337 (¶¶7-9).[3] As a result, I would vacate the chancellor's judgment and remand this case to chancery court for further proceedings. On remand, all necessary parties should be joined in this proceeding before the chancellor applies the grandparent-visitation statute[4] and the *Martin*[5] factors to determine whether to award grandparent-visitation rights.

¶32. The record reflects that Dalphanie gave birth to her daughter in 2010. At the time, Dalphanie was engaged to Fredrick Thornton, whom the child's birth certificate identifies

---

[3] *See also* M.R.C.P. 19 (discussing joinder of persons needed for just adjudication); M.R.C.P. 21 (discussing misjoinder and nonjoinder of parties).

[4] Miss. Code Ann. § 93-16-3 (Supp. 2012).

[5] *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997).

as her father. Ruby testified, though, that a subsequent paternity test revealed Fredrick was not the child's biological father. Following the results of the paternity test, Fredrick and Dalphanie ended their engagement. Further testimony in the record implied that a chancery court subsequently entered a judgment against Patrick and that the judgment allegedly ordered Patrick to pay child support for Dalphanie's daughter. However, because the judgment was not made part of the record, this Court should not speculate as to its contents.

¶33. Interestingly, during the hearing on Ruby's petition for grandparent visitation, the chancellor questioned the parties as to the identity of the child's biological father. Patrick and Dalphanie's attorney informed the chancellor that no paternity test had been conducted to determine whether Patrick was, in fact, the child's biological father. The couple's attorney also informed the chancellor of the apparent child-support order against Patrick. However, the attorney stated that she brought no copy of the order with her to chancery court to admit into evidence.

¶34. The chancellor asked Patrick and Dalphanie's attorney to try to obtain a copy of the child-support order for him to review to determine whether there had been an adjudication regarding Patrick's paternity or whether Patrick was paying support for some other reason. When the hearing resumed, the chancellor reviewed "the court file from [DHS] as it relate[d] to [Patrick]." As previously acknowledged, however, the record on appeal fails to contain documentation of either a child-support order or the contents of the DHS file. Furthermore, even though the chancellor reviewed these documents during the hearing, he failed to make any on-the-record findings regarding the contents of the DHS file.

15

¶35. After the chancellor reviewed the contents of the DHS file, the parties stated, on the record, that they were not challenging the child-support order. Although Ruby testified during the hearing that she did not know whether Patrick was actually the child's father, her attorney also agreed that Ruby was not in chancery court to challenge Patrick's paternity. In addition, Patrick and Dalphanie both testified that Patrick was the child's biological father. The couple made this assertion even though the parties claimed no paternity test had been performed, the parties failed to admit any evidence to support the assertion, and the child's birth certificate failed to identify Patrick as the father.[6]

¶36. Although neither party raised the issue of jurisdiction due to a failure to join all necessary parties, "[j]urisdiction is a question of law, which [the appellate court] reviews de novo." *Issaquena Warren Counties Land Co. v. Warren Cnty.*, 996 So. 2d 747, 749 (¶5) (Miss. 2008) (citations omitted). "[A]ll courts must be constantly aware of questions of their jurisdiction to proceed and must be prepared to decide a question pertaining to jurisdiction at any time, even if the court must raise the issue on its own motion." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1120 (¶25) (Miss. Ct. App. 1999) (citation omitted).

¶37. In establishing the parties who must be joined in a proceeding for grandparent-visitation rights, section 93-16-5 states:

> *All persons required to be made parties in child custody proceedings or proceedings for the termination of parental rights shall be made parties to any proceeding in which a grandparent of a minor child or children seeks to*

---

[6] *See* Miss. Code Ann. § 93-17-1 (Rev. 2004) (establishing that, upon the petition of any person, the chancery court possesses jurisdiction "to alter the names of such person, to make legitimate any living offspring of the petitioner not born in wedlock, and to decree said offspring to be an heir of the petitioner").

*obtain visitation rights with such minor child or children*; and the court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child. Whenever visitation rights are granted to a grandparent, the court may issue such orders as shall be necessary to enforce such rights and may modify or terminate such visitation rights for cause at any time.

(Emphasis added).

¶38. As our precedent establishes, in addition to a minor child's mother, the child's legal father and putative father constitute necessary parties to a custody proceeding. *Bolivar*, 85 So. 3d at 337 (¶7). "[S]ection 93-16-5's mandate [is] clear and unambiguous that the natural parents whose parental rights have not been terminated must be parties to a grandparent-visitation proceeding." *Id.* at (¶8). Furthermore, "the requirement for the joinder of necessary parties in section 93-16-5 is jurisdictional." *Id.* (citations omitted). "As the supreme court [has] similarly found . . . , we find that to give validity and credence to the [chancellor's] judgment without joinder of necessary parties would undermine the legislative mandate in section 93-16-5." *Id.* (citation omitted).

¶39. Pursuant to Mississippi statutory law regarding the determination of a petition for grandparent visitation,[7] the record reflects that jurisdiction over the instant proceeding failed to vest in the chancery court. The chancellor lacked jurisdiction to award grandparent visitation without joinder of and service of process to the child's legal father and putative father, who constitute necessary parties to the proceeding. *See Bolivar*, 85 So. 3d at 337 (¶¶7-8). I would therefore vacate the chancellor's judgment and remand the case for further proceedings consistent with this opinion.

---

[7] *See* Miss. Code Ann. § 93-16-3; Miss. Code Ann. § 93-16-5.

¶40. In writing to remand this case, I acknowledge that the right to grandparent visitation is purely statutory and may only be awarded where the proper criteria have been met. *See Lott v. Alexander*, 134 So. 3d 369, 371 (¶6) (Miss. Ct. App. 2014); *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013). Even if the proper and necessary parties are joined to this action and are notified by service of process, then "[s]ufficient findings are [still] required under the applicable statutory framework and factors" to support an award of grandparent visitation. *Bolivar*, 85 So. 3d at 338 (¶10). Therefore, if the chancellor found upon remand that the requirements set forth in section 93-16-3(2)[8] have been met, he must still consider the factors established in *Martin* to determine "both whether to award grandparent visitation and then, if it is awarded, its extent." *Arrington v. Thrash*, 122 So. 3d 144, 149 (¶19) (Miss. Ct. App. 2013). Accordingly, after joinder of, and service of process to, all necessary parties, the chancellor should fully discuss and apply section 93-16-3's framework and the *Martin* factors to determine whether grandparent visitation is appropriate in this case.

¶41. Because I find the record reflects that not all the necessary parties to this action were served notice and joined, I find the chancellor lacked jurisdiction to award grandparent visitation. I therefore respectfully dissent from the majority's opinion because I would vacate the chancellor's judgment and remand this case to chancery court for further proceedings.

**LEE, C.J., FAIR AND JAMES, JJ., JOIN THIS OPINION.**

---

[8] Section 93-16-3(2) provides that a chancellor may award grandparent visitation where the grandparent establishes: (1) a viable relationship with the grandchild; (2) that visitation with the grandchild has been unreasonably denied by the grandchild's parent; and (3) that visitation is in the grandchild's best interest.