# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00352-COA

**STANLEY R. BOLIVAR AND CINDY BOLIVAR**                    **APPELLANTS**

**v.**

**JOYCE WALTMAN**                                             **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/12/2013 |
| TRIAL JUDGE: | HON. FRANKLIN C. MCKENZIE JR. |
| COURT FROM WHICH APPEALED: | JONES COUNTY CHANCERY COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANTS: | DEBRA LYNN ALLEN |
| ATTORNEY FOR APPELLEE: | SAMUEL S. CREEL JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | VISITATION GRANTED TO APPELLEE |
| DISPOSITION: | AFFIRMED - 06/07/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., BARNES AND ISHEE, JJ.**

**BARNES, J., FOR THE COURT:**

¶1. This appeal originates from an order by the Chancery Court of Jones County, awarding visitation of two minor children – Jason "Blake" Waltman, born October 25, 2003, and Kaylee Waltman, born October 5, 2005 – to their paternal grandmother, Joyce Waltman. Both children are wards of their maternal grandparents, Stanley and Cindy Bolivar, who were appointed by the chancery court as the children's co-guardians on May 18, 2008. The children's natural parents, Jason Waltman and Karen Clark, have a history of prolonged substance abuse and consented to the appointment of the Bolivars as the co-guardians.[1]

---

[1] A final judgment of divorce for Jason and Karen was entered on August 24, 2006.

¶2. Initially, the Bolivars allowed Joyce visitation with the grandchildren in accordance with the visitation awarded to Jason in the couple's 2006 divorce decree. But, in early 2010, the Bolivars began limiting the visitation with Joyce, decreasing it from every other weekend to every other Saturday between 8 a.m. and 5 p.m. As a result, Joyce filed a petition for visitation privileges on April 9, 2010. The chancery court entered an order on May 24, 2010, awarding certain visitation rights to Joyce, which was termed to be the "same visitation" previously awarded to her son, Jason. The Bolivars appealed that decision to this Court, and on April 3, 2012, we vacated the judgment and remanded for further proceedings because the natural parents, whose parental rights had not been terminated, were not joined as necessary parties to the action. *Bolivar v. Waltman*, 85 So. 3d 335, 337 (¶¶8-9) (Miss. Ct. App. 2012).

¶3. On June 22, 2012, Joyce, along with her son, Jason, filed a joint amended petition for grandparent-visitation privileges. The chancery court granted temporary relief on August 13, 2012, allowing her visitation with the children on the second weekend of every month. A hearing was held on November 14, 2012, where Joyce and Stanley presented testimony.[2] The chancery court entered its order and findings of fact on February 5, 2013. After considering the statutory requirements for awarding grandparent visitation[3] and the appropriate factors set forth in *Martin v. Coop*, 693 So. 2d 912 (Miss. 1997), the chancellor awarded Joyce

---

[2] Jason attended the hearing. The chancellor noted in his order granting visitation that Karen "was appropriately noticed regarding the hearing," but she was not present, nor did she file any responsive pleadings.

[3] *See* Miss. Code Ann. § 93-16-3 (Rev. 2013).

visitation of: (1) the second weekend of every month; (2) Thanksgiving weekend of every year from Friday at noon until the following Saturday at 5 p.m.; (3) December 18 through December 24 on even-numbered years; and December 26 through January 1 on odd-numbered years, which is to take the place of the regular weekend visitation. She was also granted a period of visitation of one week during the summer, the timing of which is to be agreed upon by the parties. If the parties cannot agree, the weekly visitation is to begin on the Sunday afternoon of the June weekend of visitation and continue until the following Sunday at 5 p.m. The chancery court also set forth several conditions or rules for both sets of grandparents to abide by, including (1) not smoking, drinking alcohol, or cursing around the children, (2) providing only age-appropriate games, and (3) supervising any visitation with the children's natural parents.

¶4. The Bolivars filed a motion for a new trial or, in the alternative, to alter or amend the judgment on February 22, 2013, alleging several errors in the chancery court's findings. On February 5, 2015, the chancery court denied the motion, and the Bolivars now appeal the court's decision.[4] Joyce has not filed an appellee brief. Generally, "the failure of an appellee to file a brief is tantamount to a confession of error and ordinarily would be accepted as such and the judgment of the court below would be reversed." *N.E. v. L.H.*, 761 So. 2d 956, 962

---

[4] The two-year delay in addressing the motion appears to be related to various motions filed by both parties, including a motion by the Bolivars to depose the children's counselor, which was re-noticed several times, and to introduce additional evidence. Additionally, Joyce's counsel withdrew (retired), and she was awarded time to hire new counsel.

(¶14) (Miss. Ct. App. 2000) (quoting *Green v. Green,* 317 So. 2d 392, 393 (Miss. 1975)). "However, when matters on appeal touch the welfare of a minor child, then regardless of whether a party filed a brief, this Court will 'reach the merits of the issues in this appeal, though we proceed unaided by a brief from the appellee.'" *Id*. (quoting *Allred v. Allred,* 735 So. 2d 1064, 1067 (¶9) (Miss. Ct. App. 1999)).

¶5.     Finding no error, we affirm.

## STANDARD OF REVIEW

¶6.     Unless we find that a chancery court's determination regarding visitation and its restrictions is manifestly wrong or constitutes an abuse of discretion, we are bound to accept its findings. *Lofton v. Lofton*, 176 So. 3d 1184, 1186 (¶5) (Miss. Ct. App. 2015) (citation omitted). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Id*. (quoting *Walley v. Pierce,* 86 So. 3d 918, 920 (¶8) (Miss. Ct. App. 2011)). Questions of law, however, are reviewed de novo. *Id*.

## DISCUSSION

I.      **Whether the chancery court erroneously shifted the burden of proof to the Bolivars to prove why they opposed the visitation demanded by Joyce.**

¶7.     The Bolivars contend that the chancellor "erred as a matter of law by not requiring Joyce to produce evidence that she was entitled to have court[-]ordered visitation with the

4

children." Mississippi Code Annotated section 93-16-3 establishes the statutory guidelines for determining grandparent visitation. The first guideline, set forth in subsection (1) is not relevant to the present case, as it concerns "when a grandparent can show his or her own child has not been awarded custody of the grandchild, has had parental rights terminated, or has died." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citing Miss. Code Ann. § 93-16-3(1)). Subsection (2) provides that a grandparent may petition for visitation "when a grandparent has shown: (1) that a 'viable relationship' with his or her grandchild has been established, (2) that visitation with the grandchild has been unreasonably denied by the grandchild's parent, and (3) that visitation is in the best interest of the grandchild." *Id.* (citing Miss. Code Ann. § 93-16-3(2)).

¶8. In its findings of fact, the chancery court recited the appropriate statutory requirements and concluded that Joyce had supported the children financially and "has had frequent visitation including overnight visitation for a period of time beyond that prescribed by statute." The Bolivars argue that Joyce was not required by the court to prove that she had established a viable relationship with the children, that the Bolivars had "unreasonably denied" her visitation, or that the visitation would be in the children's best interest.

    *A.    Whether Joyce established she had a viable relationship with the children.*

¶9. A "viable relationship" is defined by section 93-16-3(3) as follows:

> [T]he term "viable relationship" means a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months

5

before filing any petition for visitation rights with the child, the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year, or the child has been cared for by the grandparents or either of them over a significant period of time during the time the parent has been in jail or on military duty that necessitates the absence of the parent from the home.

The chancellor noted that at the hearing on the prior action in 2010, Joyce testified she had paid Jason's child support until 2010, when the Bolivars "began to restrict Joyce's visitation." Joyce also testified that she bought the children clothes, food and games when they visited her. The Bolivars contend there is no evidence that she voluntarily supported the children, but admit that she "may have given [the Bolivars] some money." They argue that it was unclear whether she was paying child support.

¶10. We find that the reason for any financial contributions made by Joyce to support her grandchildren does not matter. Section 93-16-3(3) makes no distinction – it merely states that the grandparent "ha[s] voluntarily and in good faith supported the child financially in whole *or in part* for a period of not less than six (6) months before filing any petition for visitation rights with the child." (Emphasis added). The chancellor found that Joyce met this requirement, and we find no abuse of discretion in his finding.

¶11. The Bolivars also argue that Joyce only procured her visitation with the children through her erroneous representation to them that she was entitled to it under the law. Regardless of how she obtained visitation, we find that Joyce met the requirement that she have frequent, including overnight, visitation with the children for more than one year. This issue is without merit.

6

B.    *Whether Joyce failed to present proof that the Bolivars unreasonably denied her visitation.*

¶12.    The Bolivars argue that Joyce "never met her burden of proof to show that she had been unreasonably denied visitation." The Bolivars reason that since Joyce was never entitled to the same visitation awarded to Jason, any restricting of visitation with the children was not "unreasonable," and they were merely "exercis[ing] their rights and perform[ing] their duties as lawfully appointed guardians" by limiting the visitation. However, the Bolivars acknowledge that they tried to "cut back contact between the children and Joyce" and "sought to limit [visitation] to every other Saturday from 8:00 a.m. until 5:00 p.m." This was due to their "desire that the children attend church on Sunday mornings, in light of the fact that Joyce . . . was not . . . home on Friday nights, and in light of Joyce['s] clearly directing the children, by her own admission, to withhold information from Cindy and Stanley[.]"

¶13.    The chancellor made no detailed findings in this regard, except to note that the Bolivars began to restrict Joyce's visitation in 2010. The chancellor further noted that Stanley "likes to be in control" and "wishes to micro-manage" how the children spend their time with Joyce. Stanley provided no specific testimony as to why the visitation was decreased in 2010, but simply acknowledged that he did not like the children to spend more than a couple of nights with Joyce because "she don't have the same . . . rules that we have." It is apparent that Stanley was restricting visitation simply because he felt it disrupted the family's schedule, and he did not approve of Joyce's failure to take the children to church

7

every Sunday that she had them. Furthermore, as Joyce noted at the hearing, in order to get the visitation that she had enjoyed prior to 2010, she had to file the action and "go through a lot." She also noted that the Bolivars will occasionally not answer the phone and fail to return her calls.

¶14. We conclude the evidence supports a finding that the Bolivars unreasonably denied visitation to Joyce.

> C. *Whether granting visitation with Joyce was in the children's best interest and the chancery court erred in its application of the* Martin *factors.*

¶15. The chancery court concluded that "because of the close relationship the children have previously enjoyed with Joyce, the [c]ourt finds that it is in the best interest of the children that such visitation occur[.]" The Bolivars argue that "ample evidence was presented as to why it is not in the best interest of the children to have such unfettered, frequent and lengthy contact with Joyce."

¶16. In determining whether grandparent visitation is in a child's best interests, the chancery court must consider the factors set forth by *Martin*, 693 So. 2d at 916. These factors include, but are not limited to:

> 1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.

> 2. The suitability of the grandparents' home with respect to the amount of supervision received by the child.

8

3.      The age of the child.

4.      The age, and physical and mental health of the grandparents.

5.      The emotional ties between the grandparents and the grandchild.

6.      The moral fitness of the grandparents.

7.      The distance of the grandparents' home from the child's home.

8.      Any undermining of the parent's general discipline of the child.

9.      Employment of the grandparents and the responsibilities associated with that employment.

10.     The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

*Id*.

¶17.    The Bolivars refute the chancellor's finding that visitation with Joyce "[did] not appear to have become a disruption until this litigation began." Their argument mainly centers around their desire for the children to attend the Bolivars' regular church every Sunday, asking Joyce to bring the children to the church on the weekends that she has them. Joyce, who lives seventeen miles away, attends a different church, although she acknowledged that she does not take the children to her church "all the time." The only other purported disruption is that Cindy cancelled the children's doctor appointment in the summer to accommodate Joyce's visitation. Upon review, although the Bolivars claim that the record is full of examples of the disruptive nature of the visitation, we must agree with the chancellor's assessment that these instances are "minor."

9

¶18. As to the other applicable factors, the chancery court noted that, at the time of the hearing, Joyce was fifty-seven years old, and reported no physical or mental issues or any criminal history. In regard to the suitability of Joyce's home, she testified that she has lived in a two-bedroom mobile home for the last several years, and the court was satisfied that the children had suitable accommodations. Although Joyce is a smoker, she testified that she tried not to smoke when the children were visiting. Joyce said that she does not drink alcohol. Her home is located only seventeen miles from the Bolivars' home, so distance is not an issue. The court also noted that while Joyce is employed at Bumpers Drive-In as a manager five to six days week, she testified that she is able to schedule her work around visitation with the children, earning three weeks of vacation a year.

¶19. The Bolivars argue that Joyce had encouraged the children to lie to them, although the only specific instance they could refer to was the fact that Joyce bought Blake a cell phone and did not "ask[ ]their permission" or tell them. Stanley insisted that the children would tell lies to him upon returning home from Joyce's, but he provided no details except to assert that "I can look at their eyes and kinda tell" when the children are not telling the truth. Stanley also noted that Blake telling lies was "an ongoing issue."

¶20. Most of the Bolivars' objections to Joyce are due to the fact that she allowed the children contact with their father, Jason, who Stanley claims was not a good "role model" because he "do[es not] believe in God." We find nothing in the record to indicate that Jason was prohibited from seeing the children. And although Joyce admitted that she let Jason and

10

his girlfriend stay at her home on one occasion when the children were there, she assured the chancery court that situation would not occur in the future. Joyce also acknowledged that when Stanley told her not to let Blake play video games one weekend as punishment, she did not abide by that wish. But, again, she stated that was only one occasion, and she has generally abided "by what [Stanley] said." The chancellor concluded that it would be difficult for Joyce to meet all the Bolivars' requirements, as it is apparent from his testimony that Stanley has very high expectations and likes "to micro-manage the time Joyce spends with her grandchildren."

¶21. The chancellor appropriately considered the applicable *Martin* factors in this case, and we find no abuse of discretion in his finding that awarding visitation to Joyce was in the children's best interest.

**II.    Whether the chancery court's award of visitation to Joyce was excessive.**

¶22. The Bolivars contend that the chancery court erred in awarding visitation to Joyce equivalent to that a natural parent would receive. The Mississippi Supreme Court has held that "visitation granted to grandparents should not be equivalent to that which would be granted to a non-custodial parent unless the circumstances overwhelmingly dictate that it should be." *Martin*, 693 So. 2d at 916.

¶23. Nonetheless, "when a chancellor finds that there are circumstances that 'overwhelmingly dictate' that a grandparent should be awarded equivalent visitation to that of a parent, those findings must be fully discussed on the record." *Townes v. Manyfield,* 883

11

So. 2d 93, 97 (¶29) (Miss. 2004). In *Arrington v. Thrash*, 122 So. 3d 144, 149 (¶¶20-21) (Miss. Ct. App. 2013), this Court considered whether the chancery court abused its discretion in awarding "liberal visitation" to the child's paternal grandparents ("eighty days of weekend and summertime vacation, plus extensive holiday visitation"), which was similar to that of a custodial parent. The child's father was deceased, and the grandparents had helped care for the child since she was a baby. *Id*. at 146 (¶¶3, 5). We noted that *Martin* made it clear that "'equivalent visitation' was not a starting point, but that it could be an ending point only in appropriate cases." *Id*. at 150 (¶22). We upheld the chancellor's decision, noting the unstable home environment provided by the natural mother and the grandparents' extensive participation in the child's life. *Id*. at 150-51 (¶¶26-27).

¶24. In awarding visitation to Joyce, the chancery court recognized that it "may be close to what is allowed a non-custodial parent." After discussing the *Martin* factors, it concluded that "because of the close relationship the children have previously enjoyed with Joyce, . . . it is in the best interest of the children that such visitation occur and . . . it would be harmful to the children not to grant it." Until 2010, Joyce had enjoyed the same visitation as that awarded to Jason. Although the Bolivars argue that she was not entitled to that much visitation, it does not change the fact that she has maintained a close relationship with her grandchildren. Furthermore, the children have minimal contact with their natural parents. Accordingly, we find no abuse of discretion in the chancery court's findings.

III. **Whether the chancery court should have given deference to the Bolivars to exercise their discretion as to how much visitation Joyce**

12

**should be allowed to have.**

¶25. The Bolivars argue that, as the custodial guardians, they should have been entitled "to some deference" by the chancellor "to determine how much visitation Joyce had with the minor children." However, the supreme court has addressed this issue in *Woodell v. Parker*, 860 So. 2d 781, 787-88 (¶¶22, 27) (Miss. 2003), holding:

> There is no language in [section 93-16-3(2)] suggesting that the custodial parent's opinion with regard to what is "in the best interest of the child" is to receive some sort of "deference" or that findings as to the fitness of a parent are to be made. However, under applicable case law, we find that "deference" is afforded to the opinion of a "natural parent" involved in a visitation dispute under this nature.
>
> . . . .
>
> Although we have deferred to the opinions and judgments of "natural parents" when it concerns the amount of visitation to be afforded grandparents, we have not provided that "custodial adoptive grandparents" . . . should be afforded the same presumptions under the grandparents' visitation rights statutes.

In the present case, the Bolivars are not the children's parents; they are their court-appointed guardians. The rights of neither natural parent have been terminated. Thus, we find no merit to this argument, and we affirm the chancellor's judgment.

¶26. **THE JUDGMENT OF THE CHANCERY COURT OF JONES COUNTY, SECOND JUDICIAL DISTRICT, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, CARLTON, FAIR, JAMES, WILSON AND GREENLEE, JJ., CONCUR.**